UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

WILLIAM ALEXANDER,

Petitioner,

– against –

RAYMOND COVENY,
Superintendent of Elmira
Correctional Facility, and
LETITIA JAMES, New York
State Attorney General,

Respondents.

21 Civ. 1006 (___)

**PETITIONER'S
APPENDIX
IN SUPPORT OF
PETITION FOR
HABEAS CORPUS**

JANET E. SABEL
THE LEGAL AID SOCIETY
CRIMINAL APPEALS BUREAU
199 Water Street, 5th Floor
New York, New York 10038
(212) 577-3442
WILL A. PAGE, Of Counsel
*Attorney for Petitioner*

# TABLE OF CONTENTS

Page

Motion for Leave to Proceed *In Forma Pauperis* (U.S. S. Ct.).......................A1 - A5

Petition for a Writ of Certiorari (U.S. S. Ct.)................................................. A6 - A22

Appendix Submitted with Cert. Petition (U.S. S. Ct.)............................... A23 - A97

  N.Y. Appellate Division Decision (Mar. 6, 2019)............. A25-A26

  Trial Testimony and Trial Court Evidentiary Rulings....... A27-A94

  N.Y. Court of Appeals Leave Denial (June 27, 2019)...............A95

  Copy of the Mugshot Excluded at Trial......................................A96

  Relevant Constitutional Provisions............................................A97

Waiver of Response by Brooklyn District Attorney (U.S. S. Ct.).......................A98

Supreme Court Docket (Showing Request for Response) (U.S. S. Ct.).. A99 - A100

Response by Brooklyn District Attorney to Petition (U.S. S. Ct.) ........ A101 - A133

Petitioner's Reply to State's Opposition to Petition (U.S. S. Ct.) .......... A134 - A143

Denial of Cert. Petition (Order List of Feb. 24, 2020) (excerpted) ...... A144 - A148

No. _____

# In the
# Supreme Court of the United States

WILLIAM ALEXANDER,

*Petitioner,*

*v.*

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent.*

---

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF THE STATE OF NEW YORK,*
*APPELLATE DIVISION, SECOND DEPARTMENT*

---

## MOTION FOR LEAVE TO PROCEED
## *IN FORMA PAUPERIS*

---

Alan S. Axelrod
  *Counsel of Record*
Will A. Page*
LEGAL AID SOCIETY
  CRIMINAL APPEALS BUREAU
199 Water Street, 5th Floor
New York, New York 10038

  * Admitted in N.Y. and
    the Second Circuit

*Counsel for Petitioner*

1

## MOTION FOR LEAVE TO PROCEED
## *IN FORMA PAUPERIS*

Petitioner William Alexander moves for leave to proceed *in forma pauperis*, and to file the enclosed Petition for a Writ of Certiorari to the Supreme Court of the State of New York, Appellate Division, Second Department.

On March 30, 2015, Petitioner was granted, under New York County Law § 722, leave to so proceed in the Supreme Court of the State of New York, Appellate Division, Second Department.  A copy of that court's order is attached to this motion.

Respectfully submitted,

*Alan S. Axelrod*

Alan Axelrod
   *Counsel of Record*
Will A. Page
LEGAL AID SOCIETY
   CRIMINAL APPEALS BUREAU
199 Water St. 5th Floor
New York, NY  10038
(212) 577-3470
AAxelrod@legal-aid.org

September 23, 2019

# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

M189890
V/

RUTH C. BALKIN, J.P.
L. PRISCILLA HALL
SHERI S. ROMAN
JEFFREY A. COHEN, JJ.

—————————————————————

2015-00834

The People, etc., respondent,
v William J. Alexander, appellant.

(Ind. No. 10999/12)

—————————————————————

DECISION & ORDER ON MOTION
Motion for Poor Person Relief
and to Assign Counsel

 

Motion by the appellant pursuant to CPL 460.30 for an extension of time to take an appeal from a judgment of the Supreme Court, Kings County, rendered December 23, 2014, for leave to prosecute the appeal as a poor person, and for the assignment of counsel.

Upon the papers filed in support of the motion and the papers filed in relation thereto, it is

ORDERED that the motion is granted; and it is further,

ORDERED that the appellant's moving papers are deemed to constitute a timely notice of appeal; and it is further,

ORDERED that the appeal will be heard on the original papers (including a certified transcript of the proceedings, if any) and on the appellant's and the respondent's briefs; the parties are directed to file nine copies of their respective briefs and to serve one copy on each other; and it is further,

ORDERED that the stenographer of the trial court is directed promptly to make, certify, and file two transcripts of the proceedings of any pretrial hearings, of the plea of guilty or of the trial, and of the imposition of sentence in this action, except for those minutes previously transcribed and certified (*see* 22 NYCRR 671.9); and it is further,

March 30, 2015

Page 1.

PEOPLE v ALEXANDER, WILLIAM J.
**[ A3 ]**

ORDERED that in the event that the case was tried to a conclusion before a jury, the stenographer shall also make, certify, and file two transcripts of the minutes of proceedings during jury selection; and it is further,

ORDERED that the Clerk of the trial court shall furnish one certified transcript of each of the proceedings set forth above to the appellant's counsel, without charge (*see* CPL 460.70); assigned counsel is directed to turn over those transcripts to the respondent when counsel serves the appellant's brief on the respondent; and it is further,

ORDERED that in the event the stenographer has already prepared a copy of any of the minutes for a codefendant, then the Clerk of the trial court is directed to reproduce a copy thereof for assigned counsel; and it is further,

ORDERED that, upon service of a copy of this decision and order on motion upon it, the Department of Probation is hereby authorized and directed to provide assigned counsel with a copy of the presentence report prepared in connection with the defendant's sentencing, including the recommendation sheet and any prior reports on the defendant which are incorporated in or referred to in the report; and it is further,

ORDERED that in the event an issue as to the legality, propriety, or excessiveness of the sentence is raised on appeal, or if assigned counsel cites or relies upon the probation report in a brief or motion in any other way, counsel shall provide a complete copy of such report and any attachments to the court and the District Attorney's office prior to the filing of such brief or motion; and it is further,

ORDERED that pursuant to County Law § 722 the following named attorney is assigned as counsel to prosecute the appeal:

Seymour W. James, Jr., Esq.
The Legal Aid Society
199 Water Street - 5th Floor
New York, New York 10038

and it is further,

ORDERED that the appellant's time to perfect the appeal is enlarged; assigned counsel shall prosecute the appeal expeditiously in accordance with this Court's rules (*see* 22 NYCRR 670.1, *et seq.*) and written directions; and it is further,

ORDERED that in the event the file has been sealed, it is hereby unsealed for the limited purpose of allowing assigned counsel or his or her representative access to the record for the purpose of preparing the appeal; such access shall include permission to copy the papers insofar as they pertain to the appellant; and it is further,

March 30, 2015                                                                                    Page 2.

PEOPLE v ALEXANDER, WILLIAM J.
[A4]

ORDERED that assigned counsel is directed to serve a copy of this decision and order on motion upon the clerk of the court from which the appeal is taken.

BALKIN, J.P., HALL, ROMAN and COHEN, JJ., concur.

ENTER:

Aprilanne Agostino
Clerk of the Court

*Appellant's Address*:
14-A-1476
Cape Vincent Corr. Fac.
P.O. Box 599
Cape Vincent, N.Y. 13618

No. _____

# In the
# Supreme Court of the United States

WILLIAM ALEXANDER,

*Petitioner,*

*v.*

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent.*

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE SUPREME COURT OF THE STATE OF NEW YORK,
APPELLATE DIVISION, SECOND DEPARTMENT*

## PETITION FOR A WRIT OF CERTIORARI

Alan S. Axelrod
  *Counsel of Record*
Will A. Page*
LEGAL AID SOCIETY
  CRIMINAL APPEALS BUREAU
199 Water Street, 5th Floor
New York, New York 10038

  * Admitted in N.Y. and
    the Second Circuit

*Counsel for Petitioner*

i

## QUESTION PRESENTED

Whether *Chambers v. Mississippi*, 410 U.S. 284 (1973), and its progeny require the admission of reliable photographic evidence of what an accused was wearing on the day in question, particularly where the defense to the charges is one of misidentification, where no forensic evidence ties the accused to the crime, and where the excluded photographic evidence contradicts all eyewitness testimony.

ii

## TABLE OF CONTENTS

**Page**

QUESTION PRESENTED ......................................... i

TABLE OF AUTHORITIES .................................... iii

OPINIONS AND ORDERS BELOW ........................ 1

JURISDICTION ....................................................... 1

CONSTITUTIONAL PROVISIONS INVOLVED.... 1

INTRODUCTION .................................................... 2

STATEMENT OF THE CASE ................................. 3

REASONS FOR GRANTING THE PETITION ....... 9

CONCLUSION ....................................................... 13


Appendix A:   Opinion of the Supreme Court of
  the State of New York, Appellate Division,
  Second Department, dated March 6, 2019 ....... 1a

Appendix B:   Trial testimony and trial court
  evidentiary rulings. ........................................... 3a

Appendix C:   Leave denial from the
  Court of Appeals of the State of New York,
  dated June 27, 2019......................................... 71a

Appendix D:   Mugshot excluded from trial ........ 72a

Appendix E:   Constitional provisions involved .. 73a

iii

## TABLE OF AUTHORITIES

**Cases**

*Caetano v. Massachusetts*,
    136 S. Ct. 1027 (2016) ...................................... 9

*Chambers v. Mississippi*,
    410 U.S. 284 (1973), ...............................*passim*

*Crane v. Kentucky*,
    476 U.S. 683 (1986) ......................................... 9

*Holmes v. South Carolina*,
    547 U.S. 319 (2006) ...............................*passim*

*Kubsch v. Neal*,
    838 F.3d 845 (7th Cir. 2016) ..................*passim*

*Scrimo v. Lee*,
    No. 17-3434, --- F.3d ----, 2019 WL 3924811
    (2d Cir. Aug. 20, 2019) ............................. 11-12

## PETITION FOR A WRIT OF CERTIORARI

William Alexander respectfully petitions for a writ of certiorari to review the judgment of the Supreme Court of the State of New York, Appellate Division, Second Department.

## OPINIONS AND ORDERS BELOW

The opinion of the Supreme Court of the State of New York, Appellate Division, Second Department appears at Appendix A and is reported at *People v. Alexander*, 93 N.Y.S.3d 608 (N.Y. App. Div. 2d Dep't 2019). The oral rulings of the Supreme Court of the State of New York, County of Brooklyn, denying admission of Mr. Alexander's arrest photograph were made *in limine* and appear at Appendix B.

## JURISDICTION

The Second Department entered its opinion on March 6, 2019. The New York Court of Appeals denied permission to appeal in an order dated June 27, 2019, which appears at Appendix C and is reported at 33 N.Y.3d 1066 (2019). This Court's jurisdiction is invoked under 28 U.S.C. § 1257(a).

## CONSTITUTIONAL PROVISIONS INVOLVED

The relevant constitutional provisions from the Sixth and Fourteenth Amendments are reproduced at Appendix E.

2

## INTRODUCTION

This case presents a critical opportunity for the Court to reaffirm longstanding principles of criminal constitutional law through the simple application of *Chambers v. Mississippi*, 410 U.S. 284 (1973), and its progeny to an erroneous, severely detrimental, and one-sided exclusion of defense evidence—petitioner's mugshot. This case is unencumbered by extraneous considerations, namely AEDPA deference, making it ideal for summary treatment.

At trial, petitioner repeatedly sought to introduce his mugshot in support of his misidentification defense. The importance of the photo was simple: How could petitioner, as alleged, be the perpetrator of a robbery committed by a man wearing a distinctively bright outfit when his clothing was so drab? The robber was chased from the scene, arrested in flight, and photographed that day—and no forensic evidence tied petitioner to the crime. Thus, petitioner's mugshot cast grave doubts on the witnesses' identifications.

Despite urging that *Chambers* required the admission of the photo, the trial court ruled it was a) irrelevant, b) unreliable, and c) lacking foundation. In contrast, the court allowed the prosecution to introduce every photograph proffered. The court explained that "no . . . United States Supreme Court . . . law [] says that the fundamental rulings of evidence are to be twisted into an unrecognizable shape, to allow a defendant to present a defense." (60a-61a.) This Court should summarily reverse, given the trial court's erroneous understanding of the law and unjustifiable disparate treatment of petitioner.

3

## STATEMENT OF THE CASE

1. In December 2012, on a Brooklyn street in the early afternoon, a man wearing a bright yellow hoodie with a blue vest committed an armed robbery. After a short chase, with the complainant and an eyewitness pursuing the suspect, officers recognized and arrested a man based on that same brightly colored outfit. That man—the armed robber—was taken to the station and photographed. Apparently, so was Mr. Alexander, who is pictured, in custody, below. (*See* Mugshot, App'x D.)



Petitioner's arrest photograph, above, shows what *he* was wearing that day—drab maroon colors that

4

could not be mistaken for the universally accepted description of the robber's yellow and blue outfit. Nevertheless, the prosecution claimed that Mr. Alexander was the man that committed the armed robbery.

2. At trial, the complainant and an eyewitness described the individual wearing the bright yellow hoodie with a blue vest who committed the armed robbery, as having the hood pulled over his head and appearing to be a teenager. They detailed how, after witnessing the robbery, the eyewitness immediately helped the complainant into his car and the two chased after the robber, who was fleeing on a bike. The eyewitness also described calling the police and relaying the description of the robber—and his bright yellow hoodie and blue vest—to the 911 operator while the two were chasing after the man on the bike.

The jury learned that New York City Police Officers Thomas and Jordan, after receiving information from the 911 call, subsequently saw a black man wearing a yellow hoodie with a blue vest ride by on a bicycle. Recognizing his brightly colored outfit, they pursued, caught, and arrested him. When the eyewitness and complainant arrived on the scene shortly thereafter, they saw a black man in a yellow hoodie and blue vest being arrested.

3. Notably, Officer Jordan testified at the Grand Jury, just as she had reported in the arrest paperwork, that she had recovered a gun from the scene of the arrest. (*See* 40a.) Indeed, she told the officer conducting the forensics investigation that she had "recovered the gun on the sidewalk[.]" But, when that officer sought a DNA sample for elimination purposes, she refused to provide one. (34a-35a.)

5

Her refusal was troubling enough.  But then, under oath at the pre-trial hearings, she changed her story and testified that it was actually Officer Thomas who recovered the gun after they pursued the perpetrator wearing the yellow hoodie and a blue vest.  (*See* 5a.)[1]  Despite being the officer who took the photographs of the bike, of the recovered money, and of Mr. Alexander, Officer Jordan never testified at trial.[2]

4.  Maintaining his innocence, petitioner attempted to introduce his arrest photograph, taken by Officer Jordan, to irrefutably show that he was not, on the day in question, the man wearing the bright yellow hoodie and blue vest.  Indeed, Mr. Alexander was 39 years old, not 19, and his maroon and gray outfit resembled the robber's in style only.

The trial judge, however, repeatedly excluded the mugshot, giving ever shifting reasons for why it could not be admitted.

---

[1] Thomas repeated the new story at trial, testifying he used gloves to retrieve the weapon, placed it in a paper bag, and turned it over to Jordan once it was deemed safe.  (14a-15a.)

[2] Although defense counsel agreed that there would be "no questioning regarding any pending cases" involving Officer Jordan, specifically her domestic violence charges, (37a; *see also* 50a), Jordan indicated that if she had been called as a witness she would have asserted her Fifth Amendment rights.  Understandably, she was likely concerned about a) the conflict between her statements made at the Grand Jury versus during the pre-trial hearings and b) her refusal to provide a DNA sample in relation to the gun "recovered" at the scene.  Indeed, at trial, everyone recognized the issue: "when [Jordan] testified under oath at [the] hearing [she] admitted that her testimony in the grand jury was *incorrect*[.]"  (40a-41a (emphasis added).)

6

For example, the judge claimed the photo was un-
reliable and irrelevant, because it conflicted with the
description of the perpetrator. (20a-21a.) The judge
suggested Mr. Alexander could forgo his right against
self-incrimination, take the stand, and "testify as to
how he looked and if these were his clothes," perhaps
rendering the photo relevant and reliable. (22a.) Oth-
erwise, the judge asserted the defense could not "get[]
past the[] evidentiary issues" surrounding the photo,
because there was no proof that Mr. Alexander had
not changed his clothes. (42a-46a.)

But nothing other than rampant speculation was
presented to render the photo, taken by the police, un-
reliable. The fact that it conflicted with the witnesses'
testimony actually made it all the more relevant and
critical to Mr. Alexander's misidentification defense.

Then, after the defense pushed again to introduce
the photograph and argued that denying Mr. Alexan-
der the opportunity to put this critical piece of identi-
fication related evidence before the jury violated his
constitutional rights to present a defense, citing to
*Chambers v. Mississippi*, 410 U.S. 284 (1973), the
prosecution and the court shifted rationales. This
time, the prosecution asserted there was a lack of an
evidentiary foundation for the arrest photo—because
the officer who took the photograph, Officer Jordan,
had not testified. (57a-62a.) Of course, when Jordan
was later questioned with respect to a missing wit-
ness charge, she indicated that she would have as-
serted her Fifth Amendment rights in a blanket
fashion to avoid testifying. (69a-70a.)

Moreover, and contrary to the lack of foundation
contention, Officer Jordan's partner, Officer Thomas,

7

*was* able to confirm at trial that whomever they transported from the scene of the arrest to the precinct (whether it was the robber or Mr. Alexander) did not receive any visitors prior to being photographed.

Thus, either the photo depicted the robber, but cast grave doubts on the witnesses' veracity given the difference in his clothing, or it depicted Mr. Alexander who was, in fact, not the robber—just another man in a hoodie pulled out of lock-up and charged with the armed robbery. Or, as the defense repeatedly tried to assert, this was a case of misidentification.

Even without the photographer herself (Officer Jordan),[3] Officer Thomas's testimony should have been sufficient to authenticate this photograph, which the prosecution conceded depicted Mr. Alexander. Indeed, the prosecution had no problem admitting, over defense objection, Officer Jordan's photographs of a) the bicycle that the robber was riding and b) the money recovered from the actual robber. (8a-10a; 11a-13a.)

---

[3] When the defense sought a missing witness charge, after being denied the ability to question Jordan as a hostile witness, (55a-56a), the court questioned her directly. The judge asked, "If you were called to the stand on this case, would you have asserted your Fifth Amendment privileges [to] not testify?" (69a.) Jordan indicated that, "Yes," she "would have." (*Id.*)

The defense then tried to examine her about her actions as "the arresting officer in the case" to establish the extent of her adversity, but the court cut-off any questioning. (70a.) The defense could not clarify whether her Fifth Amendment refusal related to "her open case" or to "the arrest of Mr. Alexander," because the court allowed no further questions. (*Id.*)

8

Apparently, whenever the prosecution sought to admit photos through Officer Thomas—the only police witness made available—the evidentiary foundation was unquestioned. But when Mr. Alexander tried to admit a reliable and contemporaneous depiction of what he was wearing on the day of the robbery, the court would not budge. Most relevantly, the trial court stated that it knew of "no . . . United States Supreme Court . . . law that says that the fundamental rulings of evidence are to be twisted into an unrecognizable shape, to allow a defendant to present a defense. All defenses that are presented must comply with the rules of evidence." (60a-61a.)

With the photo excluded, petitioner was convicted and sentenced to 25 years of imprisonment.

5. On direct appeal, the Appellate Division, Second Department, of the Supreme Court of New York determined that there was no foundation for the admission of the photograph and, in any event, the failure to admit it was harmless. (App'x A.)

The Appellate Division did not engage with the constitutional issues presented, nor did it mention that the only other piece of physical evidence recovered—the gun—had never been handled by Mr. Alexander. The prosecution's own DNA expert had concluded it was over 350 times more likely that three random people had handled the gun than petitioner.

Thus, the allegedly overwhelming evidence of guilt in this case was apparently the eyewitnesses' and testifying officer's testimony that Mr. Alexander was the man in the yellow hoodie, even if that is not what was depicted in the photo.

9

New York's highest court, the Court of Appeals, denied leave to appeal on June 27, 2019.  (App'x C.)

### REASONS FOR GRANTING THE PETITION

Mr. Alexander is serving 25 years for an armed robbery committed by a man wearing a yellow hoodie and a blue vest.  Since *Chambers v. Mississippi*, 410 U.S. 284 (1973), and *Crane v. Kentucky*, 476 U.S. 683 (1986), the rules have been clear: "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Crane*, 476 U.S. at 690, and where those "constitutional rights directly affecting the ascertainment of guilt are implicated," evidentiary rules "may not be applied mechanistically to defeat the ends of justice," *Chambers*, 410 U.S. at 302.  Nevertheless, time and time again this Court has had to remind the States of the vitality of these important protections against "arbitrary" rules.  *See Holmes v. South Carolina*, 547 U.S. 319, 325-26 (2006) (considering the examples from *Washington v. Texas*, *Chambers*, *Crane*, and *Rock v. Arkansas* in reversing another arbitrary application of a State rule of evidence).  Because this case is just another example in a long line of such deprivations, error correction via summary reversal is appropriate.  *See, e.g.*, *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1028 (2016) (per curiam) (where the "explanation the Massachusetts court offered for upholding [a] law [prohibiting stun guns] contradict[ed] this Court's [recent] precedent," certiorari granted, state judgment vacated, and the case remanded).

10

Despite this Court's strenuous warning against the danger of excluding defense evidence after "evaluating the strength of only [the prosecution's] evidence," *Holmes*, 547 U.S. at 331, the trial court in this case committed exactly the same error. When the trial judge concluded that the conflict between the witnesses' description of the perpetrator and the photo of Mr. Alexander rendered the photographic evidence unreliable or irrelevant, the court committed the same single-sided error in logic as in *Holmes*. "The point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." *Holmes*, 547 U.S. at 331.

Moreover, there is a fundamental inequity in allowing the prosecution to present photographs taken by an officer who does not testify, only to bar the admission of similar photographs when introduced by the defense. Two adages intersect in this case: "what is good for the goose is good for the gander" and "a picture is worth a thousand words." The prosecution benefitted from the photos in this case, while Mr. Alexander was denied the same opportunity. Perhaps this stark—and unjustifiable—disparate treatment explains why defense counsel repeatedly raised the issue, arguing again and again with the trial judge that this photograph had to be admitted in order to preserve petitioner's constitutional right to present a defense. Indeed, the exclusion of such evidence in similar circumstances is so contrary to this Court's established precedent as to warrant habeas relief. *See, e.g.*, *Kubsch v. Neal*, 838 F.3d 845, 858 (7th Cir. 2016) (en banc) (discussing the well-established "lessons

11

from the *Chambers* line of cases" with respect to the erroneous exclusion of exculpatory videotaped interviews of two witnesses); *see also Scrimo v. Lee*, No. 17-3434, --- F.3d ----, 2019 WL 3924811, at *14 (2d Cir. Aug. 20, 2019) (habeas granted after *Chambers* violation, unaddressed by Second Department, deprived accused of chance to introduce reasonable doubt).

The jury never had a chance to see the photo for themselves.  The issue of how Mr. Alexander could be the perpetrator—when the robber was never out of sight long enough to have performed a miraculous wardrobe change—was never fully presented to the jury because they could not compare the contemporaneous photograph to the witnesses' descriptions for themselves.  Although they heard that a photo existed that showed him in "different clothes," they could not weigh the witnesses' credibility against photographic proof of what Mr. Alexander was actually wearing. They could not decide whether the wrong black man in a hoodie had been pulled out of lock-up or off the street and charged with someone else's offenses.

Summary reversal is appropriate here for many of the reasons recognized by the circuit in *Kubsch*. First, this case, like the *Chambers* line of cases, deals with the exclusion of evidence directly relevant to the asserted defense—misidentification.  Second, the evidence was essential: it was photographic evidence of what Mr. Alexander was wearing at the time of his arrest, which directly contradicted the witnesses' description of the perpetrator.  Third, the photograph was reliable, as it was police-generated.  And, in contrast to *Holmes*, the collateral evidence (the forensic evidence) did not match petitioner.

12

His DNA was not found on the handgun recovered at the scene; instead, it was at least 350 times more likely that the DNA "mixture" that was recovered did not include any genetic material from Mr. Alexander.

Finally, as the Seventh Circuit eloquently stated in *Kubsch*, "the state cannot regard evidence as reliable enough for the prosecution, but not for the defense." *Kubsch*, 838 F.3d at 858. The "lack of parity," *id.*, was on full display in this case, where the prosecution was allowed to admit photographs taken by the non-testifying officer but the defense was not. If the photographic evidence in this case was reliable enough for the prosecution, then it should have been reliable enough for Mr. Alexander to present his complete misidentification defense. Instead, "the jury never [saw] a critical additional piece of evidence, which, if credited, would have permitted them to find that the police had the wrong man." *Id.* at 850; *see also Scrimo*, 2019 WL 3924811, at *14 ("wrongfully excluded testimony would have introduced reasonable doubt where none otherwise existed").

Recognizing that the trial court's exclusion of Mr. Alexander's arrest photo runs afoul of *Chambers* and its progeny, including *Holmes*, this Court should grant the petition to correct an error of constitutional dimension, vacating petitioner's conviction, and remanding the case for further proceedings.

13

## CONCLUSION

For the foregoing reasons, the Court should grant
the petition for a writ of certiorari.

Respectfully submitted,

Alan Axelrod
   *Counsel of Record*
Will A. Page
LEGAL AID SOCIETY
   CRIMINAL APPEALS BUREAU
199 Water St. 5th Floor
New York, NY  10038
(212) 577-3470
AAxelrod@legal-aid.org

September 23, 2019

# APPENDIX

## TABLE OF CONTENTS

Appendix A:     Supreme Court of the State of New York, Appellate Division, Second Department opinion, March 6, 2019. ..........................1a

Appendix B:     Trial testimony and trial court evidentiary rulings. ..................3a

Appendix C:     Court of Appeals of the State of New York leave denial, June 27, 2019. .......................71a

Appendix D:     Mugshot excluded from trial. .72a

Appendix E:     Constitutional provisions involved. ..................................73a

1a

# APPENDIX A

### Supreme Court of the State of New York
### Appellate Division: Second Judicial Department

D58399
G/afa

_____AD3d_____                                    Argued - December 7, 2018

WILLIAM F. MASTRO, J.P.
JEFFREY A. COHEN
JOSEPH J. MALTESE
HECTOR D. LASALLE, JJ.

_____

2015-00834                                         DECISION & ORDER

The People, etc., respondent,
v William Alexander, appellant.

(Ind. No. 10999/12)

_____

        Janet E. Sabel, New York, NY (Anita Aboagye-Agyeman and Will Page of counsel),
for appellant.

        Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove, Jean M. Joyce,
and Sullivan & Cromwell LLP [Michele C. Materni], of counsel), for respondent.

        Appeal by the defendant from a judgment of the Supreme Court, Kings County
(Vincent Del Giudice, J.), rendered December 23, 2014, convicting him of robbery in the first degree
and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing
sentence.

        ORDERED that the judgment is affirmed.

        Contrary to the defendant's contention, the Supreme Court providently exercised its
discretion in excluding a photograph from evidence, as the defendant failed to lay a sufficient
foundation for its admission (see People v Price, 29 NY3d 472, 479-480; cf. People v Wells, 161
AD3d 1200; People v Marra, 96 AD3d 1623, 1626, affd 21 NY3d 979). In any event, even if
erroneous, the failure to admit the photograph was harmless, as the proof of the defendant's guilt was
overwhelming and there is no significant probability that the jury would have acquitted the defendant
had the photograph been admitted (see People v Crimmins, 36 NY2d 230).

March 6, 2019                                                        Page 1.
               PEOPLE v ALEXANDER, WILLIAM

2a

The sentence imposed was not excessive (*see People v Suitte*, 90 AD2d 80).

MASTRO, J.P., COHEN, MALTESE and LASALLE, JJ., concur.

ENTER:

Aprilanne Agostino
Clerk of the Court

March 6, 2019                                        Page 2.

PEOPLE v ALEXANDER, WILLIAM

3a

# APPENDIX B

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS : CRIMINAL TERM : PART 27

- - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK    :    INDICTMENT NO.
                                            10999-2012
          - against -               :

WILLIAM ALEXANDER                   :

                    DEFENDANT    :    HEARINGS

- - - - - - - - - - - - - - - - - - - -X

                    320 JAY STREET
                    BROOKLYN, NEW YORK  11201

                    MARCH 18, 2014

BEFORE:    HONORABLE RUTH SHILLINGFORD, JUSTICE

APPEARANCES:

        CHARLES J. HYNES, ESQ.
            District Attorney, Kings County
            BY:  STEPHANIE ROSENFELD, ESQ.
                Assistant District Attorney

        THE LEGAL AID SOCIETY
            Attorney for Defendant
            BY:  STEVEN KLIMAN, ESQ.
            BY:  CLINTON HUGHES, ESQ.

                        GEORGE DAVID DAVILA
                        SENIOR COURT REPORTER

4a

```
                DIRECT - P.O. JORDAN - ROSENFELD          9
 1      Q.    Once you saw the defendant riding on his bike, what
 2   happened next?
 3      A.    We actually made a U-turn.  He passed me and we
 4   actually made a U-turn.  So we were actually driving the
 5   opposite way of traffic.  We put our lights and sirens.  I put
 6   my window down, told him to stop and he continued to ride his
 7   bike.
 8      Q.    And what happened after?
 9              THE COURT:  One moment, please.
10              MS. ROSENFELD:  I apologize.
11              THE COURT:  You indicated that you told him to
12      stop?
13              THE WITNESS:  Yes.
14              THE COURT:  Continue.
15      Q.    After you told him to stop what happened?
16      A.    He continued to ride his bike.  He actually attempted
17   to go on the curb.
18      Q.    What happened when he attempted to go on the curb?
19      A.    He actually fell.  So I jumped out of the vehicle.  I
20   grabbed him but before I grabbed him, he pulled out a weapon
21   and threw it to his side, to his right.
22      Q.    Did you see what type of weapon it was?
23      A.    It was a nine millimeter pistol.
24      Q.    Now, after you saw him throw the pistol to the side
25   and then you saw him on the ground, what did you do?
```

5a

```
                    DIRECT - P.O. JORDAN - ROSENFELD          10
 1        A.  Well, he got up on his own and threw the gun to the
 2   side.  I just grabbed him and we cuffed him.
 3        Q.  Just backtracking a little bit, was that gun that was
 4   thrown to the side ever recovered?
 5        A.  Yes.
 6        Q.  Who recovered it?
 7        A.  My partner, Officer Thomas.
 8        Q.  What type of gun was it?
 9        A.  It was a nine millimeter.
10        Q.  Was it loaded?
11        A.  Yes.
12        Q.  Now, after you stopped the defendant did you ever have
13   a chance to meet with the victim?
14        A.  Yes.
15        Q.  Do you remember the victim's name?
16        A.  Yudelka Veras.
17             THE COURT:  Veros?
18             THE WITNESS:  Veras with an "S".
19        Q.  How did you come to meet the victim?
20        A.  She actually came to the scene and identified the
21   perpetrator.
22        Q.  How did she come to the scene?
23        A.  She was actually in a friend's car, I think.  She was
24   in another car.  She wasn't in a police car.
25        Q.  When she came to the scene, did you have a chance to
```

6a

```
                                                              1

 1  SUPREME COURT OF THE STATE OF NEW YORK

 2  COUNTY OF KINGS:  CRIMINAL TERM:  PART: 25

 3  ---------------------------------------X

 4  PEOPLE OF THE STATE OF NEW YORK,        :
                                                    Indictment
 5                                          : No. 10999/12

 6          -against-                       :

 7  WILLIAM ALEXANDER,                      :

 8                      Defendant.          :
    ---------------------------------------X

 9                          320 Jay Street
                            Brooklyn, New York
10                          December 1, 2014

11  B E F O R E:

12      HONORABLE VINCENT DELGIUDICE,
                Justice of Supreme Court
13
    A P P E A R A N C E S:
14
        KENNETH P. THOMPSON, ESQ.
15          DISTRICT ATTORNEY KINGS COUNTY
        BY: STEPHANIE ROSENFELD, ESQ.
16          DAVID RASKIN, ESQ.
        Assistant District Attorneys
17
        LEGAL AID SOCIETY
18          175 Remsen Street
            Brooklyn, New York 11201
19      BY: BHARATI NARUMACHI, ESQ.
            CLINTON HUGHES, ESQ.
20      Attorneys for the Defendant

21      MERCEDES FERNANDEZ,
            Official Spanish Interpreter
22

23
                        PHYLLIS PRICE
24                      SCOTT ISAACS
                        OFFICIAL COURT REPORTERS
25
                                                             PP
```

[ A30 ]

7a

Direct - PO Thomas                                    75

1    A    Him right there, with the white shirt.

2              THE COURT:  Indicating the defendant.

3              MS. ROSENFELD:  Thank you, your Honor.

4    Q    Now you said you saw the defendant riding a bike down

5  Fulton Street.

6         Is that going towards Chestnut Street, or away from

7  Chestnut Street?

8    A    Away from Chestnut Street.

9    Q    Now, after you saw the defendant riding the bike,

10  what happened next?

11   A    He rode past us, at the point.

12        When he got to my vehicle, he made eye contact with

13  me and my partner, and I made eye contact with him.

14   Q    And after you made eye contact with him?

15   A    I put the turret lights on the vehicle.  I turned the

16  vehicle around.  I drove behind the defendant, and hit the

17  siren.

18   Q    Did you ever lose sight of the defendant?

19   A    No.

20   Q    Was your view of the defendant ever obstructed by

21  anything?

22   A    No.

23   Q    Now, you are following the defendant.  What happens?

24   A    When I got close to behind him, I hit I siren.  And

25  he jumped off the bike, and threw the gun to the ground.

                                                        PP

8a

Direct - PO Thomas                                      76

1       Q    Had you instructed the defendant to stop?

2       A    Yes.

3       Q    How did you do that?

4       A    Police, stop, don't move.

5       Q    And did the defendant stop?

6       A    Yes.

7       Q    Then what happened?

8       A    He put his hands up. My partner had him at gunpoint,

9   while I went over to the side of him to put the handcuffs on

10  him.

11      Q    Now, you said you saw the defendant throw something.

12           What did you see him throw?

13      A    A black handgun.

14      Q    And where did he throw the gun to?

15      A    On the sidewalk.

16      Q    Now, did you ever hit the defendant with your police

17  vehicle while he was on the bicycle?

18      A    Never.

19           MS. ROSENFELD:  I'd like to have this marked as

20      People's number Two for identification.

21           (People's  2, marked for identification.)

22      Photo of bike

23      Q    Officer, do you recognize what's been handed to you

24  as People's number Two for identification?

25      A    Yes.

PP

9a

Direct - PO Thomas - Voir Dire                    77

1      Q    What do you recognize it to be?

2      A    The black bicycle he was riding that day.

3      Q    Is that photo a fair and accurate representation of

4  what the defendant's bike looked like on December 29th 2012?

5      A    Yes.

6           MS. ROSENFELD:  I would like to have this moved

7      into evidence as People's number Two in evidence.

8           THE COURT:  Voir dire or exception, Counsel?

9           MS. NARUMACHI:  If I may voir dire?

10          THE COURT:  Go right ahead.

11 VOIR DIRE EXAMINATION

12 BY MS. NARUMACHI:

13     Q    Who took that photograph?

14     A    The arresting officer.

15     Q    And who is the arresting officer in this case?

16     A    Officer Jordan.

17     Q    Do you know when that photo was taken?

18     A    The day of.

19     Q    And how do you know that?

20     A    She told me.

21     Q    She told you that she took that photo?

22     A    Yes.

23     Q    You weren't present when that photo was taken?

24     A    No.

25     Q    You did not process any of the voucher paperwork --

                                                   PP

10a

Direct - PO Thomas                                          78

1          THE COURT:  Sustained.  What does that have to

2    do, it is an exhibit.

3          Voir dire on the photograph.

4          MS. NARUMACHI:  I apologize, Judge.

5          (Whereupon, counsel confers with co-counsel.)

6          MS. NARUMACHI:  Judge, I would argue it goes to

7    authenticating the bike.

8          THE COURT:  You have an objection to it?

9          MS. NARUMACHI:  I do have an objection.

10          THE COURT:  Your objection is overruled.

11    That is the bike you saw?

12          THE WITNESS:  Yes.

13          THE COURT:  It is in evidence.

14          (People's 2 marked in evidence.)

15    Photo of bike

16          MS. ROSENFELD:  If I may publish it to the jury

17    now?

18          THE COURT:  Go ahead.

19          (Whereupon, exhibit published to the jury.)

20    Q    Officer, again, you recognize this bike?

21    A    Yes.

22    Q    Where do you recognize it from?

23    A    The defendant was riding on December 29th.

24    Q    Thank you very much.

25          After the defendant had stopped, and after he threw

                                                            PP

11a

                              Direct - PO Thomas                    83

1                    (Whereupon, the following was held in open court
2         before the jury.)
3                    THE COURT:  Okay, Miss Rosenfeld.
4                    MS. ROSENFELD:  Thank you.
5         Q    Officer, looking at People's number Three for
6    identification.
7                    Who recovered the actual money off of the defendant?
8         A    I did.
9         Q    And once you recovered that money off of the
10   defendant, what did you do with it?
11        A    I handed it to Officer Jordan.
12        Q    Did you see what Officer Jordan did with it?
13        A    No.
14        Q    Did you see how this photocopy was made?
15        A    No.
16        Q    Officer, now when you recovered the money off of the
17   defendant, did you take a look at it?
18        A    Yes.
19        Q    And how much money do you recall there to be?
20        A    $40.
21        Q    And what were the denominations?
22        A    $20 and two 10s.
23        Q    And is this photocopy a fair and accurate
24   representation of the money that you recovered off the
25   defendant on December 29th 2012?

                                                                    PP

12a

```
                     Direct - PO Thomas - Voir Dire              84

 1       A    Yes.

 2             MS. ROSENFELD:  At this time, I would ask it be

 3       received into evidence as People's number Three.

 4             THE COURT:  Voir dire?

 5             MS. NARUMACHI:  Yes.

 6  VOIR DIRE EXAMINATION

 7  BY MS. NARUMACHI:

 8       Q    You testified you recovered an amount of money from

 9  Mr. Alexander?

10       A    Yes.

11       Q    Was it 20 and two $10 bills?

12       A    Yes.

13       Q    Do you know the serial numbers on those dollars,

14  those items?

15       A    No.

16       Q    And you didn't see the money, what happened with the

17  money after you gave it to Officer Jordan?

18       A    No.

19       Q    And you didn't see the photocopying of those bills

20  that are in front of you?

21       A    Can you repeat the question?

22       Q    You didn't see a photocopy made of that money, did

23  you?

24       A    No.

25             MS. NARUMACHI:  I would object, Judge.

                                                              PP
```

13a

Direct - PO Thomas - Voir Dire                    85

1          THE COURT:  Let me ask you a question.

2     You gave Jordan 40 bucks, right?

3          THE WITNESS: Yes.

4          THE COURT: 20 and two 10s?

5          THE WITNESS: Yes.

6          THE COURT: She comes back to you, and she has a

7     picture of a $20 bill, and two 10s, the photostat?

8          THE WITNESS:  On the day no, she didn't.

9          THE COURT:  Did Jordan photostat the $20 bill,

10    and two 10s that you took from the defendant's pocket?

11         THE WITNESS: Yes.

12         THE COURT:  Is that the photostat?

13         THE WITNESS: Yes.

14         THE COURT:  It is in evidence.

15         MS. NARUMACHI:  I would object.

16         THE COURT:  Fine.  You have grounds for appeal.

17    Goes to weight not admissibility.

18              (People's 3 marked in evidence.)

19    Photo of currency

20         MS. ROSENFELD:  At this time, I would like

21    People's number Three to be taken out of the packaging so

22    I could publish it to the jury.

23         THE COURT:  Show her on the overhead.

24         THE COURT:  I think everybody saw a $20 bill,

25    and two 10's.

                                              PP

14a

Direct - PO Thomas                                    86

1          Okay, let's move on.

2              THE COURT:  Officer, at the time you searched

3     the defendant and recovered the $40, did you recover any

4     other money from the defendant?

5     A    No.

6     Q    After you finished searching the defendant, what did

7  you do next?

8     A    I placed him in the vehicle.  And recovered the gun.

9     Q    And where did you find the gun?

10    A    On the sidewalk.

11    Q    And did you pick the gun up?

12    A    Yes.

13    Q    Did you use anything to pick the gun up with?

14    A    Gloves.

15    Q    And what type of gun was it?

16    A    A black .9-millimeter.

17    Q    Was it loaded?

18    A    Yes.

19    Q    What did you do with the gun after you picked it up?

20    A    I put it in a paper bag, and put it in the back seat.

21    Q    Why did you do that?

22    A    So I wouldn't get my fingerprints on it.  And for

23  security.

24    Q    And what did you do with the gun after you put it in

25  the back seat of your vehicle?

                                                      PP

15a

Direct - PO Thomas                                                  87

1      A    We went back to the precinct to call ESU, the

2  detective and a police officer, to make sure it was rendered

3  safe.

4      Q    And after it was rendered safe by ESU, what was done

5  with the gun?

6      A    They handed it to Officer Jordan.

7      Q    What happened next?

8      A    Officer Jordan took a photograph of it.

9      Q    And after the gun was photographed, what happened

10 next?

11     A    After that, I went home.

12     Q    Before you went home, was the gun ever given to ECT?

13     A    Yes.

14     Q    What is ECT?

15     A    Evidence collection.

16     Q    And after the gun was processed by ECT, do you know

17 what Officer Jordan did with the gun?

18     A    No.

19     Q    Was the gun ever vouchered?

20     A    Yes.

21     Q    Do you know what voucher number was given to the gun?

22     A    Yes.

23     Q    What was the voucher number of the gun?

24     A    3000161995.

25     Q    And, Officer, did you bring the gun with you here

                                                                   PP

16a

Direct - PO Thomas                                    88

1   today?

2       A    Yes.

3               MS. ROSENFELD:  I would like to have that marked

4       as People's number Four for identification.

5               THE COURT:  Okay.

6               (People's  3, marked for identification.)

7       Handgun

8       Q    Sir, the gun that you brought with you today, you

9   recognize it?

10      A    Yes.

11      Q    And what do you recognize it to be?

12      A    A black .9-millimeter handgun.

13      Q    And is that the gun that you recovered off the ground

14  on December 29th 2012?

15      A    Yes.

16              THE COURT:  I think we are going to take a

17      luncheon recess right now.

18              Ladies and gentlemen, I ask you to come back at 2:15,

19      okay.

20              Please keep an open mind.

21              Don't form, or express any opinions, or conclusions

22      with respect to the evidence in the case until I submit it

23      to you for your deliberations.

24              Don't discuss this case amongst yourselves, or with

25      anyone else.

                                                          PP

17a

P.O. Remel Thomas - Cross - Narumanchi

1  gun far away from Mr. Alexander?

2      A    No.

3      Q    Isn't it true that the gun was not recovered next to

4  him?

5      A    The gun was recovered approximately four feet from

6  him.

7      Q    Now, as the arresting officer in this case, Officer

8  Jordan is the person who completed the police reports in this

9  case?

10      A    Yes.

11      Q    And, for example, she completed the arrest report?

12      A    Yes.

13      Q    She completed the complaint report?

14      A    Yes.

15      Q    And she also took the gun to the ECT Unit?

16      A    Yes.

17          MS. NARUMANCHI:   Now, I would like to hand up to

18  Officer Thomas what has been marked as Defense Exhibit A

19  for identification only.

20      Q    Now, Officer Thomas, directing your attention to that

21  photo, do you recognize this photo?

22      A    I recognize the person in the photo, but he's wearing

23  different clothes.

24      Q    Was this photo taken on December 29th of 2012?

25      A    Yes.

si

[ A41 ]

18a

P.O. Remel Thomas - Cross - Narumanchi

1    Q    Was it taken at the 75th Precinct?

2    A    Yes.

3    Q    And what do you recognize this photo to be?

4    A    A photo of the defendant dressed in different clothes.

5    Q    Is it an arrest photograph?

6    A    Yes.

7    Q    And when arrest photographs are taken, they are taken

8    at the police precinct after arrests; right?

9    A    Yes.

10   Q    And typically, the arresting officer is present during

11   that photograph being taken?

12   A    Not always.

13   Q    Not always.  But typically there?

14   A    Yes.

15   Q    And does it fairly and accurately represent how

16   Mr. Alexander appeared on December 29th of 2012?

17   A    Mr. Alexander was wearing multiple clothes that he

18   could have exchanged.

19   Q    Other than the colors of the clothing, does it fairly

20   and accurately represent how Mr. Alexander appeared on

21   December 29th of 2012?

22   A    It's Mr. Alexander but in different clothes.

23   Q    I understand that.  Does it fairly -- outside of the

24   colors of the clothing, does it fairly and accurately represent

25   how he appeared on December 29th of 2012?

si

19a

107

P.O. Remel Thomas - Cross - Narumanchi

1    A    Yes.

2            MS. NARUMANCHI:  At this time, Judge, I would

3    like to move this into evidence.

4            THE COURT:  Voir dire?

5            MS. ROSENFELD:  First the People would like to

6    note their objection.  Yes, a quick voir dire.

7            THE COURT:  Usually it's the other way around, I

8    would think.

9    VOIR DIRE EXAMINATION

10   BY MS. ROSENFELD:

11   Q    Officer, what was the defendant wearing at the time

12   that you saw him on the street?

13           THE COURT:  Sustained.

14   Q    Officer, do you recall what the defendant was wearing

15   when you first saw him?

16   A    Yes.

17   Q    What was he wearing?

18           THE COURT:  Sustained.  It's going to the

19   admissibility of the photograph, not what the defendant was

20   wearing.  He already said that he changed his clothes.

21   Q    So, Officer, this photo, is it representing what the

22   defendant was wearing at the time you first saw him on the

23   street?

24   A    No.

25   Q    So it does not fairly and accurately represent what he

si

20a

108

Side bar

1  looked like at the time you first saw him?

2     A    No.

3          MS. ROSENFELD:  The People note their objection.

4          THE COURT:  Side bar.

5          (The following occurs at side bar out of the

6     presence of the jury.)

7          THE COURT:  Okay.  I would just like an offer of

8     proof as to what the relevance of the photograph is.

9          MS. NARUMANCHI:  Judge, it's relevant to the

10    theory of the defense that we have already said in our

11    opening it's mistaken identification, and Mr. Alexander was

12    not the individual who robbed Ms. Veras, that his clothing

13    was substantially different than the description of the

14    perpetrator, and that's why it's relevant to this case.

15    It's very key to the defense case.

16          THE COURT:  Both witnesses, this officer and

17    Villafane, indicated this is a picture of the defendant

18    who's on trial but he's changed his clothes.  So they

19    already indicated that's the facial features, that's the

20    man, but the outer garments that he has on, to wit, just

21    the jacket and the scarf are different because he still has

22    the jeans on.

23          MR. HUGHES:  I'm sorry to interrupt --

24          THE COURT:  Only the attorney that's -- I'll give

25    you as much time as you want to, but I don't see how it's

                                        si

**[ A44 ]**

21a

Side bar

1   relevant if both witnesses indicated this wasn't the

2   clothing he was wearing.

3          MS. NARUMANCHI:  Well, Judge, but it was a

4   photo --

5          THE COURT:  Are you going to bring in testimony

6   to establish this was the clothes he was wearing at the

7   time of the offense?

8          MS. NARUMANCHI:  Well, I mean they are going to

9   deny that that was the clothing that he was wearing at the

10  time of the offense.

11         THE COURT:  So far three witnesses have

12  testified --

13         MS. NARUMANCHI:  I understand.

14         THE COURT:  -- that he had a yellow hoodie and a

15  blue vest with jeans.  This shows the person dressed in a I

16  guess a bubble jacket with a scarf at the precinct.

17         MS. NARUMANCHI:  It's a gray hoodie.  This was a

18  photo taken of him at the precinct while he was under the

19  control of the officers.  And I could continue to question

20  on that, but --

21         THE COURT:  What's the relevance?

22         MS. NARUMANCHI:  It's relevant to the

23  identification, Judge.  We're arguing it's not him, that

24  he's not the perpetrator, and that they are wrong.  They

25  arrested an African American man wearing similar clothing.

                                                    si

22a

Side bar

1    think that that is actually relevant to the question on

2    those colors and whether or not he could have actually

3    changed his clothing in the precinct.  He was escorted

4    directly from the site to the precinct.  He was in their

5    custody the entire time, so I think it does go to our

6    defense.

7            But additionally, in terms of the police officers

8    and questioning on that, it also goes to a motive to lie

9    about a variety of different issues in this case.

10           THE COURT:  Okay.  Your application is denied.

11   It's not coming into evidence.  I believe you haven't

12   sufficiently established how it's probative.  Maybe if your

13   client wants to take the stand, he could testify as to how

14   he looked and if these were his clothes.  But so far three

15   witnesses, three separate witnesses all indicated at the

16   scene of the arrest the clothing he had worn, and two of

17   them looked at this piece of evidence and said that's him,

18   but his clothing has been changed.

19           Okay.  So I find this to be not reliable and is

20   not to your point.  If there is some kind of sponsoring

21   testimony that this was the clothing that he was wearing

22   and they arrested the wrong guy, and these three witnesses

23   were under some mass delusion, I'll let it come in.

24           (Back in open court.)

25   CROSS EXAMINATION - CONTINUED

si

[ A46 ]

23a

114

P.O. Remel Thomas - Cross - Narumanchi

1   BY MS. NARUMANCHI:

2       Q    Now, Officer Thomas, we were discussing the fact that

3   Officer Jordan is the arresting officer in this case.

4           Now, you were with Officer Jordan when Mr. Alexander

5   was arrested; correct?

6       A    Yes.

7       Q    And you along with Officer Jordan escorted him to the

8   precinct?

9       A    Yes.

10      Q    And at the precinct he was processed for an arrest?

11      A    Yes.

12      Q    And we had just discussed as part of that processing,

13  photos were taken; correct?

14      A    Yes.

15      Q    Now, typically -- he didn't have any visitors at the

16  precinct; did he?

17      A    No.

18      Q    And did you voucher any of the clothing that he was

19  wearing that day?

20      A    No.

21      Q    And I had just shown you a photograph for

22  identification.  You said that the colors of the clothing were

23  different; correct?

24      A    Yes.

25      Q    You maintain a memo book as part of your duties as a

                                                        si

24a

P.O. Remel Thomas - Cross - Narumanchi

1   police officer?

2       A    Yes.

3       Q    And the photo that I showed you was taken that day, on

4   December 29th of 2012?

5       A    Yes.

6       Q    And it was taken at your precinct, the 75th

7   Precinct?

8       A    Yes.

9       Q    Now, part of writing notes in your memo book is you

10  notate things that happened while you are on duty; right?

11      A    Yes.

12      Q    And that day you noted down a description of a

13  perpetrator in the robbery?

14      A    Yes.

15      Q    And you noted in your memo book that he was wearing a

16  yellow hoodie?

17      A    Yes.

18      Q    And a blue vest?

19      A    Yes.

20      Q    Now, you didn't note that he was wearing different

21  clothing at the precinct?

22      A    No.

23      Q    You didn't note that the colors of the ski vest were

24  different than the description that you received?

25      A    No.

                                                    si

25a

118

P.O. Remel Thomas - Cross - Narumanchi

1           THE COURT:  Next witness.

2           MR. RASKIN:  Your Honor, the People are calling

3    Police Officer Kevin Hutchinson.

4           COURT OFFICER:  Witness entering.

5           THE COURT:  Very well.

6           COURT OFFICER:  Remain standing.  Face the clerk.

7           THE CLERK:  Please raise your right hand.

8           KEVIN  HUTCHINSON, was called as a witness by and

9    on behalf of the People, having been first duly sworn by

10   the Clerk of the Court, testified as follows:

11          THE CLERK:  Be seated.  Please state your name

12   and spell it for the record.

13          THE WITNESS:  Officer Kevin Hutchinson,

14   K-E-V-I-N, H-U-T-C-H-I-N-S-O-N.

15          THE CLERK:  Shield number?

16          THE WITNESS:  Shield 18979.

17          THE CLERK:  And command?

18          THE WITNESS:  Brooklyn North Evidence Collection

19   Team.

20          THE CLERK:  Thank you.

21          THE COURT:  Thank you.  How are you doing?

22          THE WITNESS:  How are you doing, sir?

23          THE COURT:  Welcome to my courtroom.  I ask you

24   to do three things, speak right into the microphone, look

25   the jury in the eye when you answer, and if you hear the

                                              si

26a

119

P.O. Remel Thomas - Cross - Narumanchi

1   word "objection", say no.

2            THE WITNESS:  You got it.

3            THE COURT:  Thank you.

4   DIRECT EXAMINATION

5   BY MR. RASKIN:

6       Q    By whom are you employed?

7       A    New York City Police Department.

8       Q    In what capacity?

9       A    Police Officer.

10      Q    How many years have you been a police officer?

11      A    Twelve years now.

12      Q    How many years have you been assigned to ECT?

13      A    Six years.

14      Q    Just describe to the jury what ECT stands for.

15      A    It stands for Evidence Collection Team.

16      Q    As an officer assigned to the Evidence Collection

17  Team, what are your duties and responsibilities?

18      A    Basically we go to crime scenes and try to collect any

19  evidence that's left at the scene.

20      Q    What kind of cases do you become involved in in that

21  capacity?

22      A    Become involved in burglaries, robberies, shootings

23  that are non-fatal, and gun cases.

24      Q    And what do you do specifically when you become

25  involved in those type of cases?

                                                si

27a

120

P.O. Kevin Hutchinson - Direct - Raskin

1    A    Well, we go through the scene and we try to process

2  whatever is at the scene.

3    Q    I'm going to direct your attention to December 29,

4  2012.  Did you become involved in an investigation into an

5  incident that occurred on Chestnut Street in Brooklyn?

6    A    Yes.

7    Q    How did you become involved in that?

8    A    We had a call saying that there was a robbery with a

9  gun that was recovered at the location.

10   Q    What exactly did you do with respect to that

11  investigation?

12   A    Well, I responded to the 75th Precinct where the gun

13  was brought back to, and I processed the firearm there.

14   Q    Just describe to the jury what you did in the

15  processing of that firearm?

16   A    Well, I swabbed the firearm for DNA.  Basically, we

17  have like a long Q-tip, we put distilled water on the tip of

18  the cotton swab, and we swab the area of the firearm that was

19  touched the most.

20   Q    Why would you swab a firearm?

21   A    Just to see who was handling the firearm.

22   Q    You mentioned DNA.  Were there any other reasons why

23  you would swab a firearm?

24   A    Any other reason?

25   Q    Yes.

si

28a

P.O. Kevin Hutchinson - Direct - Raskin

1    A   Like I say, just to find out who touched the firearm.

2    Q   Did you also swab to get a fingerprint?

3         MR. HUGHES:  Objection, Your Honor, to the

4  leading.

5         THE COURT:  Overruled.  I could allow a little

6  bit of latitude.

7    A   We dust the firearm for fingerprints.

8    Q   In this case, where exactly did you respond to?

9    A   The 75th Precinct.

10    Q   And once you arrived at the 75th Precinct, what were

11 you given?

12    A   I was given a black Kel-Tec .9-millimeter pistol.

13    Q   What did you do once you received that gun?

14    A   I began processing, I began swabbing the different

15 parts of the firearm for DNA.

16    Q   Just describe to the jury how you processed that

17 particular gun?

18    A   There are certain parts of the firearm that are

19 touched the most times, like the trigger, trigger guard, the

20 handle of the firearm, and also the slide grip on top of the

21 firearm, so I take a separate swab for each item and I swab

22 those particular items, try to recover DNA from them.

23    Q   Officer, what did you do with those swabs once you

24 finished swabbing that firearm?

25    A   I vouchered it.

si

29a

122

P.O. Kevin Hutchinson - Direct - Raskin

1   Q    What voucher number did you voucher those swabs?

2   A    Voucher number 3000162090.

3   Q    What did you do with the property after it was

4   vouchered under voucher number 3000162090?

5   A    I sent it to the OCME for DNA analysis.  OCME stands

6   for Office of the Chief Medical Examiner.

7   Q    For what purposes were the swabs sent there?

8   A    For DNA analysis.

9   Q    From your observations of the gun with your own eyes,

10  would you be able to tell if there was any DNA on the gun?

11  A    No, sir.

12  Q    Did you do anything else with the gun at that point?

13  A    After that I dusted the firearm for fingerprints.

14  Q    How did you dust that gun for fingerprints?

15  A    I use a feather duster and dipped it in some white

16  powder and I applied the powder over the entire firearm.

17  Q    Were you able to lift any fingerprints from that gun?

18  A    No, sir.

19  Q    What are some reasons why fingerprints from a person

20  who just touched the gun may not be on that gun?

21  A    Well, sometimes the firearm could be wiped clean, and

22  also some firearms are made where they will not rust so water

23  can't penetrate.  So fingerprints are mostly water so a

24  fingerprint won't adhere to the firearm.  It could also be

25  because of the weather.  Sunlight and heat will evaporate any

si

30a

P.O. Kevin Hutchinson - Direct - Raskin

1 secretions left on a firearm.  Cold weather would prevent a
2 person from perspiring too often, so you won't be able to
3 fingerprint a firearm because of that.  And also if it is
4 raining, items left out in the rain, it could wash away the
5 prints also.
6        MR. RASKIN:  Thank you, Officer.  No further
7    questions, Your Honor.
8        MR. HUGHES:  Thank you, Your Honor.  Your Honor,
9    is it all right if I cross from the defense table?
10       THE COURT:  Go right ahead.
11 CROSS EXAMINATION
12 BY MR. HUGHES:
13    Q    Good afternoon, Officer Hutchinson.
14    A    How are you doing, sir?
15    Q    I'm well, thank you.
16         Now, you were just talking about fingerprinting the
17 gun and some reasons why you might not be able to get
18 fingerprints.
19         Now, prior to dusting the gun for fingerprints, you
20 had applied a moistened Q-tip, basically, to three parts of the
21 gun; right?
22    A    Correct.
23    Q    That was to the trigger and the trigger guard?
24    A    Correct.
25    Q    And that was to the back strap and the grips?

si

31a

124

P.O. Kevin Hutchinson - Cross - Hughes

1    A    Right, the handles of the firearm.

2    Q    And the slide?

3    A    Correct.

4    Q    And that might be a reason, applying a moistened Q-tip

5    might be a reason to rub off some --

6    A    For those parts of the firearm, correct.

7    Q    And you've been trained to swab those three areas;

8    right?

9    A    Yes, sir.

10    Q    And you are trained that those areas are potentially

11    good areas for collecting skin cells that have been rubbed off;

12    right?

13    A    Correct.

14    Q    And then those skin cells could be analyzed at the

15    lab?

16    A    Yes.

17    Q    And on the trigger, trigger guard, you could get skin

18    cells potentially from someone whose got their index finger on

19    that area of the gun; right?

20    A    Yes.

21    Q    Either when they are firing it or when they are just

22    holding it?

23    A    Just holding it.

24    Q    Now, part of your job in processing a firearm is to

25    question about elimination samples; correct?

si

32a

125

P.O. Kevin Hutchinson - Cross - Hughes

1     A    Correct.

2     Q    And that sample would be a Q-tip as well put in the

3 cheek of someone who may have touched the evidence; right?

4     A    Correct.

5     Q    And in order to determine who needs to give an

6 elimination sample, you need to find out who may have touched

7 the gun; right?

8     A    Correct.

9     Q    And you are also trained that DNA can actually

10 transfer from one item to another; right?

11    A    Correct.

12    Q    For example, from a glove of a gun, if someone touches

13 their face before touching the gun with their gloved hand;

14 right?

15    A    Yes, sir.

16    Q    And DNA can be transferred by someone who was touching

17 the outside of their gloves as they were putting them on, if

18 they were -- or in another way before they touched the item?

19         MR. RASKIN:  Objection, Your Honor.

20         THE COURT:  Sustained.

21    Q    So one of the things that you do when you are trying

22 to find out who to request elimination samples from is to find

23 out any NYPD officers who actually recovered the evidence at

24 the crime scene wherever the gun was recovered; right?

25    A    Correct.

si

33a

Side bar

1    recovery of the gun?

2            MS. ROSENFELD:  I don't recall off the top of my

3    head.  I would have to go out and get my grand jury

4    minutes.

5            THE COURT:  Let me see it.

6            These minutes were turned over to you, the grand

7    jury minutes?

8            MR. HUGHES:  Yes.

9            THE COURT:  What's in there about her?

10           MR. HUGHES:  I think my recollection is she

11   recovered the gun.

12           MS. NARUMANCHI:  That was my recollection, too.

13           THE COURT:  So she testified in the grand jury

14   that she was the recovering officer.

15           MR. HUGHES:  Correct.

16           THE COURT:  This guy here testified that he was

17   the recovering officer.

18           MR. HUGHES:  Yes, you mean Thomas.

19           MS. NARUMANCHI:  Yes.

20           MR. HUGHES:  Correct.

21           THE COURT:  Well, it was a full statement she

22   allegedly gave this ETC guy.

23           MR. HUGHES:  Is that he recovered the gun on the

24   sidewalk at the corner of Fulton and Pennsylvania.

25           THE COURT:  I'll let it in.  Let's go.

                                                si

34a

Side bar

1          MR. HUGHES:  Full statement?  I'll give the full

2     statement or that she recovered the gun?

3          THE COURT:  Give the statement she gave him, but

4     I'm giving a curative instruction for the purpose of the

5     submission.

6          MR. HUGHES:  Okay.

7          (Back in open court.)

8     CROSS EXAMINATION - CONTINUED

9     BY MR. HUGHES:

10     Q     So to repeat, Officer Hutchinson, Police Officer

11     Lisette Jordan told you that she had recovered the gun on the

12     sidewalk at the corner of Fulton and Pennsylvania?

13     A     Correct.

14          THE COURT:  Ladies and gentlemen, that's

15     basically a hearsay statement, what one person said to

16     another person outside of court.  And the only reason I'll

17     let it in is not for the truth of what was said but to

18     explain what the officer did once hearing that information.

19     Q     And you testified earlier you conferred with Police

20     Officer Jordan, and I believe you also conferred with Sergeant

21     Ephraim Hernandez on this case?

22     A     That was my sergeant.

23     Q     And so based on that, you requested DNA elimination

24     samples; right?

25     A     I asked Officer Jordan for an elimination sample.

                                                  si

[ A58 ]

35a

P.O. Kevin Hutchinson - Cross - Hughes

1     Q    And did you receive an elimination sample from Officer

2  Jordan?

3     A    No, I did not.

4     Q    Are officers allowed to decline providing an

5  elimination sample?

6     A    They have declined, yes.

7     Q    Is that what Police Officer Jordan did in this case?

8     A    Yes.

9     Q    And you did not request elimination DNA samples from

10 any other officer in this case; right?

11    A    No, I did not.

12           MR. HUGHES:  May I have a moment, Your Honor?

13           THE COURT:  Sure.

14           MR. HUGHES:  Nothing further, Your Honor.  Thank

15    you, Officer Hutchinson.

16           THE COURT:  Okay.  Any redirect?

17           MR. RASKIN:  Yes, Your Honor.

18           THE COURT:  Go right ahead.

19 REDIRECT EXAMINATION

20 BY MR. RASKIN:

21    Q    Officer Hutchinson, you mentioned skin cells.  Is that

22 something that's tested with a DNA swab that's sent to the

23 OCME?

24    A    Yes.

25    Q    And would the same effects in terms of whether the

si

36a

P.O. Kevin Hutchinson - Redirect - Raskin

1  ability or inability to shed affect the ability to get skin

2  cell samples from a gun as it would with fingerprints?

3          MR. HUGHES:  Objection to the opinion testimony.

4          THE COURT:  Overruled.

5  A    Yes.

6          MR. RASKIN:  No further questions, Your Honor.

7          THE COURT:  Recross?

8          MR. HUGHES:  None.  Thank you.

9          Thank you.

10         (Witness excused.)

11         THE COURT:  Ladies and gentlemen, unfortunately

12  we are going to have to have to call it an early day today.

13  The next scheduled witness through no fault of anyone is

14  unable to be here.  But I was assured that they would be

15  here bright and early tomorrow.  I would anticipate that

16  this case may be in your hands tomorrow or the latest by

17  Wednesday.  So we are moving.

18         So keep an open mind, don't form or express any

19  opinions or conclusions with respect to the evidence until

20  this case is submitted to you for your deliberations.

21  Don't discuss this case amongst yourselves or with anyone

22  else.  Don't view or visit any place or premise involved in

23  the case.  Don't read, listen or view any media reports

24  about the case.  Don't surf the internet regarding this

25  case.  Accept nothing of value for information about the

si

37a

133

Proceedings

1    trial.  If anyone intends to talk about the case, don't do
2    it.
3                Have a great night.  And let's root for those
4    Jets to get a good draft pick this year.  And we will see
5    everybody back here tomorrow at 10:00.
6                COURT OFFICER:  Jurors.
7                (Whereupon, the jury exits the courtroom.)
8                THE COURT:  Okay.  I had requested the district
9    attorney at the side bar to notify this Officer Jordan to
10   be here available tomorrow, but the officer should be
11   advised that if she's going to claim the Fifth Amendment,
12   I'm going to allow no questioning regarding any pending
13   cases that she has before her.
14               That being said, does the defense plan on calling
15   her?
16               MS. NARUMANCHI:  Judge, we are actually still
17   discussing the issue and would like to consult with my
18   supervisors back at the office.
19               THE COURT:  I understand that, but this case has
20   been pending for a considerable period of time, and you are
21   aware of the allegations that are pending against this
22   officer.  And as a litigator, one would always plan that
23   your adversary is going to call that witness or try to make
24   their case without them.  As experienced attorneys, you
25   would have planned it ahead of time.  In realizing the

si

38a

134

Proceedings

1    rules of evidence, that if you consciously know a person is
2    going to claim the Fifth Amendment, you can't ask the
3    question.  So I would not allow you -- I don't think any
4    Judge would allow you to call a witness to impeach your own
5    witness.  I just don't think that's done.  So you knew that
6    ahead of time.
7            So this woman got a pending case.  She's being
8    prosecuted.  I can order her in here, but if you are not
9    going to use it, why bother?  Why just go through all of
10   that grief, put her through the grief?  Her attorney is
11   going to get notified.  Everybody is going to be running
12   around like chicken without heads.  And 99 percent of the
13   time you are not even going to call her any way.
14           MR. HUGHES:  Can we discuss this issue with
15   Mr. Alexander?
16           THE COURT:  Sure.
17           MR. HUGHES:  Thank you, very much.  And we
18   appreciate the Court's intervention in helping --
19           THE COURT:  I understand.  Calling the witness or
20   not is solely within the power of the attorney.
21           (Pause in the proceedings.)
22           THE COURT:  Did you have enough time to consult
23   with your client?
24           MS. NARUMANCHI:  Judge, we did speak with our
25   client, and we would like Officer Jordan to be made

                                          si

39a

Proceedings

1   available.  We will be putting her on as a witness on our

2   direct case.

3          MS. ROSENFELD:  Your Honor, two pieces of note

4   with respect.  First we have some phone numbers that

5   defense could call about getting that officer made present

6   tomorrow, if they want to follow up with that.  We will put

7   a notification in through the system as well just so she

8   knows she's being called as a defense witness.  We have a

9   number we can give them.

10          THE COURT:  I asked Mr. Raskin to advise that she

11   was coming in as a defense witness.

12          MS. ROSENFELD:  Yes, I'm just saying we have a

13   phone number they can contact as well to notify her to come

14   in.  We will put it through our system as well, but there's

15   no guarantee that through the system she will get a

16   notification in time, so I have numbers they can call for

17   that.

18          However, I also wanted to follow-up with respect

19   to what her testimony is going to be, in how limited it

20   should be, because I actually just went through the

21   testimony from the hearing where Officer Jordan testified

22   and testified that in fact Officer Thomas was the one who

23   recovered the gun.  That's what she responded when I asked

24   her the direct question.  And when defense attorney,

25   Mr. Kleiman, at the time, and Clinton Hughes was also

si

40a

136

Proceedings

1    present for that, went back to on redirect, "so you
2    testified that Officer Thomas is the one who recovered the
3    gun?" Her answer was, again, yes.
4            THE COURT:  I was unaware of that.  It's very
5    difficult to be in a position to make a decision when I am
6    not fully apprized of all of the facts and nuances of the
7    case.  I was not the Judge at the hearing.  I was faced
8    with a situation where this officer testified that he
9    recovered the gun.  I was supplied the grand jury minutes
10   wherein the grand jury minutes the female officer said she
11   recovered the gun.  I think it was we or was it we or she?
12   I think it was we.
13           MS. ROSENFELD:  I'll double check so that I don't
14   speak improperly on the record.
15           The question was, "did you recover the black
16   object that you had seen him throw to the floor?"
17           Answer:  Yes.
18           THE COURT:  Fine.  That's what I was showed
19   during the conference, side bar conference.  So based upon
20   that, not wanting to have the jury misled by what I
21   perceived to be incorrect testimony of this officer, I
22   allowed in the statement of Officer Jordan to in effect
23   impeaching this officer even though they are told it's not
24   entered for the truth of the matter stated.  It's very
25   difficult to un-ring the bell.  And jurors many times don't

si

41a

137

Proceedings

1   understand.

2           So that being the case, now I find that the

3   defense was aware that Officer Jordan when she testified

4   under oath at a hearing admitted that her testimony in the

5   grand jury was incorrect, and that her partner Thomas was

6   in fact the person who recovered the firearm as he

7   testified before me.  So why, what are you going to --

8   first, I'm somewhat chagrined that the defense did not

9   bring this to my attention since the defense was present at

10  the hearing, I wasn't, and it was misleading the Court by

11  not advising me that this officer had stated at a prior

12  hearing that the officer who testified here, Thomas, did in

13  fact recover the gun.  That's one.

14          I'm also a little bit chagrined by the

15  prosecution not bringing that to my attention because I

16  would not have allowed that prior statement to come into

17  evidence.  I'm attempting to give a fair trial to both

18  sides and not have this jury misled, but I find them being

19  misled by the attorneys.  Probably not, I don't know why,

20  but I'm just getting that opinion.

21          Now knowing the fact that this officer is not

22  supportive of your case, what is your offer of proof to

23  have her called?

24          MS. NARUMANCHI:  Well, Judge, we are asking that

25  she be called so that we can put the mugshot photo into

                                                    si

42a

138

Proceedings

1    evidence.

2              THE COURT:  I already ruled that the mugshot

3    evidence, mugshot photo, as it stands, irrelevant.

4              MR. HUGHES:  Judge, you are looking at a photo

5    where a man is wearing a hoodie and a ski vest of a

6    different color.

7              THE COURT:  That's not a ski vest that he had on

8    that day, that's a full length parker.  Let me see that

9    photo again.

10             MS. NARUMANCHI:  It's a ski vest.  You could see

11   the gray sleeves through the ski vest.

12             THE COURT:  Right you are.  It's a full length

13   ski vest.  That would open the door for the People on

14   rebuttal to bring in testimony as to every person that was

15   arrested in that precinct, that was housed in the bullpen,

16   the clothing that that person had.  It's a trial within a

17   trial.  You still haven't convinced me of any testimony

18   from anywhere that that was the clothing your client had on

19   at the time of the crime.  It's clearly the clothing he had

20   on at the time that photograph was taken, but not what he

21   allegedly wore at the time of the incident.  How is that

22   relevant?  I mean there's been no proof that he didn't have

23   an opportunity to change clothes with someone else.

24             MR. HUGHES:  It would be nice if the arresting

25   officer could weigh in on it; couldn't she?  She was the

si

43a

139

Proceedings

1   one who had custody of the defendant.

2           THE COURT:  I'm not speculating on what this

3   officer could or couldn't testify to.  Because you're

4   aware, as I am, that once an arrest is made, the arresting

5   officer places the defendant after paperwork in the

6   bullpen, and there could be countless numbers of other

7   people.  There's no testimony that he was placed in a

8   solitary cell in the PD squad.  It's speculative.  I don't

9   see it.

10          MR. HUGHES:  It's speculative that he changed

11  clothes, Judge, and it's speculative that the officer was

12  not able to observe him.

13          THE COURT:  I tend to disagree with you because

14  each witness indicated that that was the man that they saw

15  out on the street, all three of them, and the three

16  witnesses identified your client as the person that was on

17  the street in distinctive clothing, and two of them saw

18  that photograph, both identified physically your client and

19  both stated that wasn't the clothes he was wearing at the

20  time they saw him on the street.  That's the only thing

21  that's not speculative right now.

22          MR. HUGHES:  That theory is that they

23  misremembered that.  And the physical evidence that they

24  misremembered that is a guy giving his arrest photo taken

25  with a hoodie and a ski vest after he's being apprehended

si

[ A67 ]

44a

140

Proceedings

1   and in the custody of the police that have different

2   colors.  It's misidentification.  That's our defense.

3          THE COURT:  What do you have to say?

4          MS. ROSENFELD:  The People just would go with

5   what the Court has already said, that you've had three

6   people take the stand and state that at the time of the

7   crime the defendant was wearing -- was a black man wearing

8   a blue vest and a bright yellow hoodie.  Two of the

9   witnesses took the stand and identified the defendant in

10  court as the same person they saw wearing a yellow hoodie

11  and a blue vest.  And also two witnesses who were shown

12  this photograph said, yes, that is absolutely the

13  defendant, that is not what he was wearing at the time that

14  the crime took place.

15         So I believe putting this photograph in front of

16  the jury is completely misleading.  If they have already

17  put forth their theory that there was a second person

18  there -- in their opening that there was a second person

19  who committed this robbery that was also on a bike, and if

20  they want to prove that, that's fine, but to say this is

21  not the wrong -- since they have already said this is the

22  guy who committed the robbery but this isn't what he was

23  wearing at the time, that doesn't go to the fact there was

24  a second person there.

25         THE COURT:  The defense isn't limited to what

                                                    si

45a

Proceedings

1   they stated on an opening.  The People by statute must

2   establish all the elements of what they intend to prove in

3   the opening.  The defense doesn't.

4        MS. ROSENFELD:  I recognize that, Your Honor, but

5   the defense keeps arguing that they have already opened on

6   this issue --

7        THE COURT:  That's their problem.

8        MS. ROSENFELD:  -- of mistaken identity.

9        THE COURT:  That's their problem on what they

10  opened on or didn't.  That doesn't affect the rules of

11  evidence.  I'm just going now on the rules of evidence,

12  that two people identified that that is a photograph of the

13  defendant but those weren't the clothes he was wearing.

14  How is that not the functional equivalent of a photograph

15  of the crime scene that's taken afterwards where movable

16  objects have changed, like cars, trees on leaves, but the

17  physical stature of the buildings are the same.  Here the

18  physical face of the defendant is the same.

19       MS. ROSENFELD:  So both witnesses were shown the

20  photos, that this was not a fair and accurate

21  representation of what the defendant looked like at the

22  time that the robbery took place.

23       THE COURT:  They said as to clothing but they did

24  say that was the defendant.

25       MS. ROSENFELD:  They did say that was the

si

46a

Proceedings

1   defendant.  So if they want to redact the photos so it's
2   just of his face, then the People would have no objection
3   to it going into evidence.  But as to the clothing, the
4   People would object.
5           THE COURT:  If this arresting officer took the
6   stand tomorrow, how would you propose getting this past
7   these evidentiary issues?
8           MS. NARUMANCHI:  Well, Judge, I would ask her if
9   it represented a fair and accurate description of what he
10  looked like at the time the photo was taken.  I'm not going
11  to ask -- obviously she's going to contradict that that's
12  what he looked like at the scene, but I would ask if that's
13  what he looked like in the precinct, and I could limit my
14  questioning to that.
15          MR. HUGHES:  Judge, we are asking -- we are
16  going -- I'm sorry to be a two-headed beast here, but we
17  are going to be arguing to the jury at the end of the day
18  that these people were misremembering that point, that
19  critical point.  It was called in, yellow and blue, they
20  thought they got the guy, looking at the face, they got the
21  guy, they processed the guy, the guy is still wearing the
22  hoodie and the vest, they take the picture, and then, you
23  know, then they start going through a process of preparing
24  for trial --
25          THE COURT:  Hold for a minute.

                                        si

47a

143

Proceedings

1      (Pause in the proceedings.)

2      MR. HUGHES:  Judge, that's going to be our

3  theory, that they misremembered.  They thought they got the

4  face.  They weren't thinking about vests and hoodies and

5  everything else, they thought they got the guy.  And then

6  when the litigation begins and witnesses are prompted and

7  complaints and DD5's and arrest reports are reviewed, and

8  lawyers talk to witnesses, and witnesses talk to lawyers,

9  at some point there is a misremembering.

10      THE COURT:  So your argument is that the clothing

11  that's depicted in this photograph is the same clothing

12  that your client got arrested in?

13      MR. HUGHES:  And that they were mistaken.  That

14  is our argument, Your Honor.

15      THE COURT:  Will they be precluded from bringing

16  in officers to testify that on numerous occasions

17  defendants switch clothing prior to the photograph, or have

18  an opportunity to do so?

19      MS. NARUMANCHI:  I mean if that's their cross

20  examination, I think they are entitled to ask that

21  question.

22      THE COURT:  Which one is speaking for the team?

23      MS. NARUMANCHI:  We would like to operate as

24  siamese twins, Judge, but I will speak for the team.

25      MR. HUGHES:  I must say I've never disagreed with

si

[A71]

48a

144

Proceedings

1    anything Ms. Narumanchi said.

2              THE COURT:  Good.

3              MR. HUGHES:  Only desire to add a point or two.

4              MS. ROSENFELD:  Your Honor, the defense has

5    themselves just said that they would expect Officer Jordan

6    to take the stand and say that this was not the clothing

7    that he was wearing at the scene, and that would just

8    testify this was the picture --

9              MS. NARUMANCHI:  At the time of arrest in the

10   precinct, that's the question I would be asking.

11             MS. ROSENFELD:  Again, that is irrelevant to what

12   he was wearing at the time of the robbery and when he was

13   stopped by the police officers.  What he may or may not

14   have changed into at the time this photograph was taken is

15   irrelevant.

16             MR. HUGHES:  Judge, to make a ruling against this

17   would defectively credit in advance all the testimony as to

18   the color of the hoodie and the ski vest.  We ask that the

19   Court let that be in the domain of the jury.  The

20   prosecution can argue whatever it wants or it can raise

21   issues as long as they are proper in the cross examination

22   of Officer Jordan, if you want to call it cross

23   examination, because I don't think she's going to be

24   hostile to the prosecution here, but that's our theory.

25             THE COURT:  Is she being prosecuted for an

si

49a

Proceedings

1   Assault 3?

2          MS. ROSENFELD:  Yes.

3          THE COURT:  By your office?

4          MS. ROSENFELD:  No, I believe it's Manhattan.

5          MS. NARUMANCHI:  It's in Manhattan.  The case is

6   on December 9th in Manhattan Criminal Court.

7          Obviously, Judge, we would not ask her about that

8   as per your ruling on that issue.  If it's more than two

9   minutes of direct examination, I will be surprised.

10          THE COURT:  She's going to come in and testify

11   that that's a picture of the defendant, but that's not the

12   clothes he had on when she arrested him.

13          MS. NARUMANCHI:  Yes.

14          MR. HUGHES:  Don't know.  We don't know yet, but

15   we know that obviously he was wearing a hoodie and he was

16   wearing a ski vest when he was arrested.  He's wearing a

17   hoodie and a ski vest when they take the picture.  So I

18   guess it's more of an issue of color than anything else,

19   Judge.  So the question is are the witnesses misremembering

20   the color, particularly the civilian witnesses, but also

21   the police witnesses at this point.  But I think it's an

22   issue of fundamental fairness that the arrest photo come

23   in.  It's not a crazy application.  This is something where

24   the defendant was in police custody.

25          Is the 75th Precinct a big changing room where

si

50a

146

Proceedings

1    they just allow all the defendants to switch each others'

2    clothes?  Maybe they can bring a witness in to say that,

3    but I thought of it as a precinct where they took reports,

4    perform general law enforcement duties and process arrests.

5          THE COURT:  Well, experienced defendants many

6    times attempt to alter their physical appearance after they

7    have been in custody, changing hairstyles, growing hair,

8    switching clothes in the precinct.  I've had clients that

9    have done that when I was on the defense, and I had

10   defendants when I prosecuted did that when I was a

11   prosecutor, and I'm sure it happens all the time.  Maybe I

12   just have more of a background than you do.

13         MR. HUGHES:  I don't now what to say, Judge.  I

14   think that the fact that there's a description in the type

15   of clothing, and then there's a picture where the precise

16   type of clothing again but with radically different colors

17   should give -- should be presented to the jury and let them

18   decide.

19         THE COURT:  You're also going to be precluded

20   from phrasing any question regarding any injury that your

21   client is alleged to have suffered after he was transported

22   from the crime scene.  And no comment about that in the

23   photo, no comment about that if it comes into evidence

24   during your summation.

25         MS. NARUMANCHI:  No comment during summation.

si

51a

147

Proceedings

1          THE COURT:  Right.  Because it's not relevant.  I

2     haven't decided on the photo, so I will reserve decision

3     until tomorrow.  Both sides should prepare either way.

4          MR. HUGHES:  Thank you, Your Honor.

5          THE COURT:  Okay.  10:00.

6          (The trial was adjourned to December 2, 2014 at

7     10:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

si