52a



53a

Trial - Colloquy                                    149

1          THE CLERK: This is Indictment 10999 of 2012,

2    William Alexander. The defense attorneys and People are

3    present. The jury and defendant is not present at this

4    time.

5          THE COURT:  Counsels, sergeant informed me that

6    Defense requested that the defendant be given a change of

7    clothing for the purposes of trial?

8          I normally -- I am not a haberdasher, and it violates

9    security protocols. The proper procedure is to have it

10   brought through the Department of Corrections, all right.

11   But I will make an exception at this time.

12         MS. NARUMACHI:  Thank you, your Honor.

13         MR. HUGHES:  Thank you, your Honor.

14         THE COURT:  But it is not going to happen again.

15         MS. NARUMACHI:  It won't.

16         THE COURT:  Are there any scheduling issues

17   regarding Police Officer Jordan, sewn and so forth?

18         MS. ROSENFELD:  No, your Honor.  She showed up

19   this morning and I brought her over to the Defense.

20         THE COURT:  So Defense, did you have an

21   opportunity to speak to Officer Jordan?

22         MS. NARUMACHI:  Yes, Judge. And I do want to

23   address our communication with her. I would just like --

24   given the seriousness of this case and --

25         THE COURT:  I am fully aware of your client's

                                                          PP

54a

Trial - Colloquy                                        150

1   right to be present. I am not making any substantive

2   argument. My simple question to you, did you have an

3   opportunity to speak to this officer?

4        Do you think that is necessary for your client to be

5   present for you to respond to that?  If so, I will wait.

6        MS. NARUMACHI:  No, Judge. We did have an

7   opportunity to speak with her.

8        THE COURT:  Good, that's all I ask.

9        THE SERGEANT:  Judge, I examined the pants they

10  are okay for him to put on.

11        THE COURT:  Is he here?

12        THE SERGEANT:  Yes, Judge.

13        THE COURT:  All right, let him put the pants on.

14        (Pause in the proceeding.)

15        THE COURT:  Defendant is now present in the

16  courtroom, the jury is still absent.

17        Ready to proceed?

18        MS. ROSENFELD:  Yes, your Honor.

19        THE COURT:  Any issues we have to attend to

20  before I bring the jury in?

21        MS. NARUMACHI:  Yes.  I want to address the

22  issue of Police Officer Jordan.  She has been made

23  available to us by the Assistant District Attorney. I did

24  speak with her this morning.  And, I would like to have

25  her declared as a hostile witness.

PP

[ A78 ]

55a

Trial - Colloquy                                    151

1          THE COURT:  This is all premature.

2          MS. NARUMACHI:  I could make my argument for

3     that at a different point.

4          But based on the conference that we had, I believe

5     that she is lying.  And I have a good faith basis to

6     believe she is lying, not only about what she put in

7     police reports, but also, she did admit she was in the

8     precinct when that photo was taken.  She wasn't present at

9     the time, but she saw it right after it was taken. And

10    based on that -- you know -- I believe she is lying. And I

11    would ask her to be declared a hostile witness.

12          THE COURT:  Well, your sponsoring a witness who

13    you think is lying, is not a definition of hostility.

14          MS. NARUMACHI:  She would be hostile to the

15    Defense because, she would testify in contradiction to the

16    police reports that she wrote.

17          And the conversation we have had about the photo and

18    what she said about the photo, that's why she is a hostile

19    witness.

20          THE COURT:  That is not the definition of

21    hostility.

22          MS. NARUMACHI: I disagree, Judge.

23          THE COURT:  Okay. Maybe my law school taught me

24    different, all right. Back in the day when I went to law

25    school, it is not because the witness is adverse to the

                                                          PP

56a

Trial - Colloquy                                    152

1     party calling them to be hostile.  It is a witness who is
2     refusing to answer questions on direct. And that decision
3     is made after the witness is on the stand.
4          But when we get to your case I will have an offer of
5     proof, and you can explain to me why you want to call a
6     witness who you believe is lying.
7          MS. NARUMACHI:  Judge, we would be, then, before
8     the People rest, we would be moving to put a missing
9     witness charge in as well. And we need to do that --
10         THE COURT:  You already made that notification
11    yesterday. I still remember it clearly in my mind.  And I
12    even commented that you had followed the prescription of
13    the Appellate Division, and you gave the People notice
14    before you rested, and then I will make a determination.
15    Because I remember, if you can make out the six elements
16    under Gonzalez, and it is progeny, then I will entertain
17    your application.
18         Anything else?
19         MS. NARUMACHI:  That's all.
20         THE COURT:  Bring in the jury.
21    Who is your witness?
22         MR. RASKIN:  Detective Scaturro, Judge.
23         COURT OFFICER:  Ready for the jury, your Honor?
24         THE COURT:  Bring the jury in.
25         COURT OFFICER:  Jury entering.

                                                        PP

57a

Trial - Colloquy                           167

1    case on the various witnesses that testified regarding the

2    incident that occurred on December 29, 2012, including the

3    victim who testified to being robbed.

4           THE COURT:  You are relying on the record?

5           MS. ROSENFELD:  I will rely on the record.

6           THE COURT:  Motion denied.

7       Defense plan on putting on a case?

8           MS. NARUMACHI:  So, your Honor, the issue that

9    we had, sort of stated before the jury came in was that,

10   we are going to call the OCME Criminalist Hardy.  But with

11   regard to the testimony of Officer Jordan.

12          THE COURT:  Let's have your offer of proof as to

13   that testimony, if you don't mind.

14          MS. NARUMACHI:  I have questioned her regarding

15   the mug shot photo in the precinct, which is our position,

16   this is a material issue for the Defense, and our client's

17   right to present a defense in this case about

18   identification that was made by the complaining witness,

19   and the eye witness.

20          THE COURT:  As I pointed out, I want the record

21   to be clear, I pointed out to you yesterday that the

22   photograph of the defendant that was taken subsequent to

23   his incarceration and seizure by law enforcement, is not

24   relevant in the sense that you are asking the jury to

25   speculate. Because, when each of the two witnesses that

                                                        PP

58a

Trial - Colloquy                                      168

1    you showed that photograph to specifically said that was

2    the defendant whom they saw on the street, but those

3    weren't the clothes that he was wearing on the street.

4         So for you to submit that photograph that it was

5    taken sometime after his arrest by the police department,

6    him having different clothes on, causes the jury to

7    speculate.

8         MS. NARUMACHI:  Well, Judge, if I may address

9    the issue of the photo?  There is actually a case which I

10   will hand up to the Court, and give a courtesy copy to the

11   People, it is People v. Sanchez 2002, 293 AD2d 499. And

12   actually, this again goes to my client's constitutional

13   right to present a defense.

14        In this case defense counsel attempted to introduce a

15   photograph. And the Court held, the denial by the trial

16   court was improper because it was relevant to a material

17   issue of identification that was part of the Defense case.

18        So, we would actually disagree.  We think the Court's

19   ruling contradicts the holding here in Sanchez.

20        Additionally, I have already raised constitutional

21   arguments on behalf of my client for his right to present

22   a defense, which is protected under the United States

23   Constitution, and the New York State Constitution as well.

24        I also brought additional case law as well to address

25   those points including, Crime v. Kentucky, 476 US 683. I

                                                      PP

59a

1    have those cases as well.

2        Additionally, Chambers v. Mississippi, 410 US 284.

3    And Washington v Texas, 388 US 14.  I have those cases as

4    well, courtesy copies for the Court and for the People

5    which I will also hand up as well.

6        Again, my colleague, Mr. Hughes, raised the issue

7    fundamental fairness yesterday which, again, I will raise

8    as a key issue in this case, with his right to present a

9    defense.

10        Not to allow testimony on his appearance on

11    December 29th of 2012, violates his Federal Constitutional

12    Right to present a defense to due process, and rights

13    under the confrontation clause.

14        We should have a fair opportunity to defend our

15    client against the State's accusations. And that photo not

16    being admitted into evidence, your Honor, we believe has

17    significantly affected our ability of our client to

18    present a defense in this case.

19        THE COURT:  People?

20        MS. ROSENFELD:  First of all, no one is telling

21    them they can't introduce the photo if they lay a proper

22    foundation.  They just have not made a proper foundation

23    to get the photo into evidence. In the case they provided,

24    People v. Sanchez, this case is different.  This is a case

25    where there were codefendants, and the Defense attempted

                                                           PP

60a

1   to introduce a photo of the codefendant to say that the

2   description more closely resembles the codefendant, as

3   opposed to the defendant. And there the Court had stopped

4   the Defense from even attempting to put the photograph

5   into evidence.

6       Where our case, Defense has been allowed twice to try

7   and put the photo into evidence, but unable to lay a

8   proper foundation.

9       MS. NARUMACHI:  Judge, if I just may address the

10  issue. There were issues with laying the foundation

11  through Officer Thomas.

12      However, I believe the Court also said they didn't

13  think the photo was relevant, which is the point we are

14  saying Sanchez addresses, the issue of relevancy in this

15  case.

16      Now while the People are right in the fact that the

17  facts of this case in Sanchez are not somewhat the facts

18  in this case, the material issue which the Court is

19  actually looking at is, whether or not the Defense had the

20  opportunity to present their defense, and

21  misidentification was the defense in that case.

22      THE COURT:  I know of no supreme court, United

23  States Supreme Court, or Court of Appeals, or Appellate

24  Division law that says that the fundamental rulings of

25  evidence are to be twisted into an unrecognizable shape,

PP

[ A84 ]

61a

Trial - Colloquy                                    171

1   to allow a defendant to present a defense. All defenses

2   that are presented must comply with the rules of evidence.

3        You failed to establish a sponsoring witness to

4   establish the introduction of the photograph.  We tried it

5   with two separate witnesses.

6        So that is not preventing the Defense from putting on

7   a defense.  That is the Defense being unable, through

8   rules of evidence, to have evidence introduced.

9        Now, I also feel that that photograph lacks

10  relevance, notwithstanding the learned bench that wrote

11  the Sanchez case. Sanchez case involved multiple

12  defendants. It was a Robbery in the Second Degree aided by

13  a person actually present.  And also indicated that the

14  Defense, at that time, would want to establish that a

15  juvenile non codefendant at trial was the perpetrator, and

16  that the wrong person got identified.  That's not the case

17  here.

18       The case here is that the defendant was identified on

19  the street by three people who testified at this trial;

20  the arresting officer's partner, the eye witness,

21  Mr. Villafane, and the complaining witness. And they all

22  testified as to the clothing that the defendant wore at

23  the time of the incident in the vicinity of Fulton Street

24  and Chestnut.

25       The photograph that was taken after the defendant was

PP

62a

Trial - Colloquy                                   172

1   in custody at a police station, without knowing the time,

2   just showing that the defendant had different clothes on,

3   does not go to the complainant's ability to recognize the

4   defendant's face. Nor does it go to the eye witness's

5   ability to recognize and identify the defendant. Nor does

6   it go to the ability of the police officer who was

7   involved in apprehending the defendant at the scene.

8        So based on the rules of evidence, you failed to lay

9   a proper foundation.  And I find that the photograph isn't

10  relevant.

11       You can certainly again try to find some way to put

12  that photograph into evidence -- you know -- if you have a

13  proper foundation. But, I am standing by my ruling.

14       Now, other than Miss Hardy, does the Defense plan on

15  putting on any other evidence?

16            MS. NARUMACHI:  Can I have just one moment to

17  confer?

18            MR. HUGHES:  Thanks, your Honor.

19            THE COURT:  No problem.

20            (Whereupon, counsel confers with co-counsel.)

21            MS. NARUMACHI:  Judge, no, we will not be

22  calling Police Officer Jordan to testify in the Defense

23  case.

24       Now, she is here in one of the witness rooms. I did

25  not want to release her, obviously, until we have made the

                                                      PP

record in front of the Court.

And then I have, when appropriate, I will make my request for a missing witness charge.

THE COURT: That comes at the charge conference.

Also, does your witness wish to testify?

(Whereupon, counsel confers with client.)

MS. NARUMACHI: No. Mr. Alexander will not be testifying in this case.

THE COURT: Mr. Alexander, you know you have an absolute right to testify in your defense; do you understand that?

THE DEFENDANT: Yes.

THE COURT: And I want to make sure that you are deciding not to testify because it is your own free will. That no one has forced you, or coerced you not to testify. And you decided by not testifying, you have the best chance of a favorable outcome in this case.

Was I correct on that?

THE DEFENDANT: Yes.

THE COURT: Did you have an opportunity to discuss this with your attorneys?

THE DEFENDANT: Yes.

THE COURT: And you all agree, it is in your best interest not to testify?

THE DEFENDANT: Yes.

PP

64a

Direct - K. Hardy                                    213

1        Miss Hardy, I ask you, if you still have that red

2    pen, I ask you to approach the exhibit F.

3        Miss Hardy, could you explain what the qualitative

4    scale, that's exhibit F, means for FST calculations?

5    A    So, the number that the FST gives, and that we then

6    use in our reports.  We say that so, if it indicates it was

7    367 times more probable.

8        So when that reported value basically -- once we have

9    that number, it then will follow to a scale here ranging from

10   one to greater than a thousand.

11       And then, depending on where that number falls in

12   this scale, we then report how much support is to which

13   probability, I guess it is.

14       So when we say it is 367 times more likely that the

15   mixture is three unknown, unrelated individuals, we need to

16   say, well, how much support?

17   Q    What exactly does that mean?

18   A    So, we give a quantitative value, as well as a

19   qualitative value in our reporting, to give you an idea of

20   what that number means.

21   Q    Miss Hardy, can you please circle the qualitative

22   interpretations corresponding to the FST results of comparison

23   between William Alexander, and the trigger/trigger guard

24   mixture in this case?

25   A    So, the reported value is 367, which falls between

                                                          PP

65a

Direct - K. Hardy                    214

1   100 and 1,000. So as the report states, it is strong support

2   here.

3       Q    Thank you, Miss Hardy.

4            MR. HUGHES: Your Honor, may I have a moment?

5            THE COURT:  Yes.

6            (Whereupon, counsel confers with co-counsel.)

7            MR. HUGHES:  Nothing further.

8            THE COURT:  Before this witness's

9   cross-examination, let's recharge the batteries.

10       Keep an open mind, folks.

11       Freshen up in the jury room. And then we will come

12   back out in around five or 10 minutes.

13       Remember all the admonitions.

14       Keep an open mind.

15            (Whereupon, the juror exits the courtroom.)

16            THE COURT:  Okay, Miss Hardy.  You can stretch

17   your legs. We will have you back on the stand in a few

18   moments.

19       All right, Counsels, be back 20 after 12.

20            (Whereupon, a brief recess was taken.)

21            (Whereupon, Phyllis Price is relieved by Scott

22   Isaacs as the official court reporter.)

23

24

25

PP

66a

221

Kendra Hardy - Cross - Rosenfeld

1   is applied in the same way in each case regardless of result?

2      A    Yes.

3      Q    Can you explain exactly what was inputted into the

4   calculation in this case?

5      A    In this case, the known profile of William Alexander

6   was inputted or put into the system.  The mixture profile from

7   the swab of the trigger trigger guard was put into the system,

8   as well as that the mixture was at least a three person

9   mixture, that information was entered, the total amount of DNA

10  that was copied, which is 175 picograms, as well as the fact

11  that the mixture was non-deducible.

12     Q    What were the results in this case?

13     A    That the mixture is 367 times more likely to be made

14  up of three unknown, unrelated individuals versus William

15  Alexander and two unknown, unrelated individuals.

16     Q    So such a result tends to favor the defendant;

17  correct?

18     A    This result does, yes.

19     Q    Isn't it true that approximately one-third of the time

20  the likelihood ratio results are actually less than one which

21  tends to indicate that the defendant is not part of a mixture

22  that you are analyzing?

23          MR. HUGHES:  Objection, Your Honor.  May we

24     approach?

25              THE COURT:  Yes.  Side bar.

                                          si

67a

239

Proceedings

1    behavior, attorneys have a right to speak to the witnesses,

2    credibility, weight of the evidence, identification, about

3    the defendant not testifying, police testimony, expert

4    testimony, what competent evidence is, and the specific

5    charges.

6            Any other specific requests to charge?  Here's

7    your time.  Here's your chance.

8            MS. NARUMANCHI:  Yes, Judge.  We are going to ask

9    that the missing witness charge be given regarding Police

10   Officer Jordan.

11           THE COURT:  As I understand the missing witness

12   charge, the witness, if called to testify, would have been

13   an adverse in a particular position than the party that

14   should have called them.  What is the adversity in the

15   People's case that this police officer --

16           MS. NARUMANCHI:  Testimony favorable to them.

17   I'm sorry, hold on one moment, Judge.  Let me just --

18           THE COURT:  As I understand the missing witness

19   charge, the jury is permitted to take a presumption --

20           MS. NARUMANCHI:  Yes, I apologize.

21           THE COURT:  -- that the missing witness would

22   have been unfavorable to the People's case.  Just show me,

23   tell me what position would be unfavorable.

24           MS. NARUMANCHI:  Judge, the position that would

25   have been unfavorable goes to several different things.

                                                    si

68a

240

Proceedings

1   The first being the color of the clothing.

2          THE COURT:  How is it different?

3          MS. NARUMANCHI:  She would have testified that

4   the clothing -- that the clothing that he was wearing at

5   the precinct did not match the description that was given

6   by the eyewitnesses and by the complaining witness.

7          THE COURT:  From what?  From what?

8          MS. NARUMANCHI:  She's also testified in the

9   grand jury.  She's testified --

10          THE COURT:  Hold it.  Bring that cop in, Jordan.

11   What's her name?  Jordan.  Catch that cop.  I'll put her on

12   the stand, have an evidentiary hearing, find out what her

13   testimony would have been.  And I'll determine whether or

14   not it would be adverse to the People.  Right now it's not

15   adverse.

16          All right.  What else?  Let not waste time.  Any

17   other requests to charge?

18          MS. NARUMANCHI:  No.  Just --

19          THE COURT:  People, do you have any that I left

20   out?

21          MS. ROSENFELD:  No, Your Honor.

22          THE COURT:  I didn't think so.  Okay.

23          COURT OFFICER:  Ready for the witness?

24          THE COURT:  Yes.

25          COURT OFFICER:  Witness entering.

si

69a

241

Proceedings

1       THE COURT:  Thank you so much for waiting around
2   all morning, I appreciate it, Officer.  If you would be so
3   inclined just to raise your right hand.
4       THE CLERK:  Raise your right hand.
5       (The witness was sworn by the clerk of the
6   Court.)
7       THE CLERK:  Please state your name for the
8   record.
9       THE WITNESS:  Lisette Jordan.
10      THE CLERK:  Thank you.  You may be seated.
11      THE COURT:  Good afternoon, Officer Jordan.
12  Thanks for coming by.  I have a question for you.
13      I'm under the understanding that there is a case
14  pending involving you as a defendant in New York County; is
15  that correct?
16      THE WITNESS:  Yes.
17      THE COURT:  If you were called to the stand on
18  this case, would you have asserted your Fifth Amendment
19  privileges and not testify?
20      THE WITNESS:  Yes.
21      THE COURT:  You would have?
22      THE WITNESS:  Yes.
23      THE COURT:  Any questions by any side?
24      MS. NARUMANCHI:  Yes, I do have some questions.
25      THE COURT:  Okay.

si

70a

Proceedings

1        MS. NARUMANCHI:  Now, you were the arresting

2   officer in the case --

3        THE COURT:  The questions go to her availability,

4   because if the witness would claim the Fifth Amendment she

5   would be unavailable for the prosecution to call to the

6   stand.

7        MS. NARUMANCHI:  To testify regarding her open

8   case, not about the arrest of Mr. Alexander.

9        THE COURT:  No, that's --

10        MS. NARUMANCHI:  That would not make her --

11        THE COURT:  All right.  Officer, you can step

12   down.  Just wait right outside.

13        (Whereupon, the witness left the stand.)

14        As I understand the law, if a witness would

15   testify and take the Fifth Amendment to answer questions,

16   she's unavailable.  The witness is unavailable.

17        Now, you had indicated through your attempt

18   during your opening and the attempt to put the photograph

19   into evidence that you were going to make allegations that

20   this officer assaulted the defendant while in the precinct

21   which would trigger her claiming the Fifth Amendment on

22   cross examination.  Because that's what you argued.  So I

23   don't see how this person is available.

24        MR. HUGHES:  Judge, I didn't -- in my opening --

25   you got the minutes before you, Your Honor -- in my opening

si

71a

## APPENDIX C

# State of New York
# Court of Appeals

BEFORE:  HONORABLE PAUL G. FEINMAN
                Associate Judge

_____

THE PEOPLE OF THE STATE OF NEW YORK,

                               Respondent,

      -against-

WILLIAM ALEXANDER,

                               Appellant.

**ORDER
DENYING
LEAVE**

_____

    Appellant having applied for leave to appeal to this Court pursuant to Criminal Procedure Law § 460.20 from an order in the above-captioned case;*

    UPON the papers filed and due deliberation, it is

    ORDERED that the application is denied.

Dated:  June 27, 2019

                                            *Paul G. Feinman*
                                            Associate Judge

*Description of Order:  Order of the Appellate Division, Second Department, dated March 6, 2019, affirming a judgment of Supreme Court, Kings County, rendered December 23, 2014.

72a

# APPENDIX D

Page 1 of 1

 

**NEW YORK CITY POLICE DEPARTMENT**

*Mugshot Pedigree*

| | |
|---|---|
| NAME: | **ALEXANDER WILLIAM** |
| NYSID#: | 06465502J |
| Arrest #: | K1717583 |
| Arrest Date#: | 12-29-2012 |
| Top Charge: | PL 2650203: CRIM POSS WEAP-3RD:DEFACE WEAP |
| Date of Birth: | 1973 |
| Age at Offense: | 39 |
| Social Security #: | |
| PCT of Arrest: | 075 PRECINCT |
| Source: | LIVE |

**PHYSICAL DESCRIPTION**

| | |
|---|---|
| Race: | BLACK |
| SEX: | MALE |
| Height: | 509 |
| Weight: | 150 |
| Hair Length: | SHORT |
| HAIR COLOR: | OTHER |
| Hair Type: | CLOSE CUT |
| Complexion: | CLEAR |
| Eye Color: | BROWN |

Scars, Marks Tattoos:
Desc:
Location:
Bodyside:

Alias 1:
Alias 2:
Alias 3:
Alias 4:



ORIGINAL

http://pmwebdata2/WebUniversalRetrieve/WebUniversalRetrieve.ASP?WCI=UniversalPrt...   3/22/2013

[ A96 ]

73a

## APPENDIX E

The Sixth Amendment to the United States Constitution provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor[.]"

The Fourteenth Amendment provides, in relevant part, "nor shall any State deprive any person of . . . liberty,  . . . without due process of law[.]"

# WAIVER

## SUPREME COURT OF THE UNITED STATES

Supreme Court Case No. 19-6063

William Alexander    v.    New York

(Petitioner)        (Respondent)

**I DO NOT INTEND TO FILE A RESPONSE** to the petition for a writ of certiorari unless one is requested by the Court.

Please check the appropriate boxes:

☑ Please enter my appearance as Counsel of Record for all respondents.

☐ There are multiple respondents, and I do not represent all respondents. Please enter my appearance as Counsel of Record for the following respondent(s):

_____

_____

_____

☑ I am a member of the Bar of the Supreme Court of the United States.

☐ I am not presently a member of the Bar of this Court. Should a response be requested, the response will be filed by a Bar member.

Signature _____

Date: October 15, 2019

(Type or print) Name: Leonard Joblove

☑ Mr.  ☐ Ms.  ☐ Mrs.  ☐ Miss

Firm: Kings County District Attorney's Office

Address: 350 Jay Street

City & State: Brooklyn, New York   Zip: 11201-2908

Phone: (718) 250-2511   Email: jobloveL@brooklynDA.org

A COPY OF THIS FORM MUST BE SENT TO PETITIONER'S COUNSEL OR TO PETITIONER IF *PRO SE.* PLEASE INDICATE BELOW THE NAME(S) OF THE RECIPIENT(S) OF A COPY OF THIS FORM. NO ADDITIONAL CERTIFICATE OF SERVICE IS REQUIRED.

CC: Alan S. Axelrod, Esq.

[ A98 ]

Supreme Court Docket

| | Search documents in this case: | Search |
|---|---|---|

## No. 19-6063

| | |
|---|---|
| Title: | **William Alexander, Petitioner**<br>**v.**<br>**New York** |
| Docketed: | September 25, 2019 |
| Lower Ct: | Appellate Division, Supreme Court of New York, Second Judicial Department |
| Case Numbers: | (2015-00834) |
| Decision Date: | March 6, 2019 |
| Discretionary Court Decision Date: | June 27, 2019 |

| DATE | PROCEEDINGS AND ORDERS |
|---|---|
| Sep 23 2019 | Petition for a writ of certiorari and motion for leave to proceed in forma pauperis filed. (Response due October 25, 2019)<br><br>**Motion for Leave to Proceed in Forma**<br>**Pauperis      Petition      Appendix      Proof of Service** |
| Oct 15 2019 | Waiver of right of respondent The People of the State of New York to respond filed.<br><br>**Main Document** |
| Oct 24 2019 | DISTRIBUTED for Conference of 11/8/2019. |
| | (Due December 4, 2019) |
| Nov 21 2019 | Motion to extend the time to file a response from December 4, 2019 to January 10, 2020, submitted to The Clerk.<br><br>**Main Document** |
| Nov 27 2019 | Motion to extend the time to file a response is granted and the time is extended to and including January 10, 2020. |
| Jan 07 2020 | Brief of respondent The People of the State of New York in opposition filed.<br><br>**Main Document      Proof of Service** |
| Jan 17 2020 | Reply of petitioner William Alexander filed.<br><br>**Main Document      Proof of Service** |
| Jan 23 2020 | DISTRIBUTED for Conference of 2/21/2020. |

[ A99 ]

Feb 24 2020                          Petition DENIED.

| NAME | ADDRESS | PHONE |
|---|---|---|
| Attorneys for Petitioner | | |
| Alan S. Axelrod<br>Counsel of Record | The Legal Aid Society, Criminal Appeals Bureau<br>199 Water Street<br>5th Floor<br>New York, NY 10038<br><br>aaxelrod@legal-aid.org | 2125773470 |
| Party name: William Alexander | | |
| Attorneys for Respondent | | |
| Leonard Joblove<br>Counsel of Record | Kings County District Attorney's Office<br>350 Jay Street<br>Brooklyn, NY 11201-2908<br><br>jobloveL@brooklynDA.org | 718-250-2511 |
| Party name: The People of the State of New York | | |

**[ A100 ]**

No. 19-6063

---

IN THE

SUPREME COURT OF THE UNITED STATES

---

WILLIAM ALEXANDER,

Petitioner,

v.

NEW YORK,

Respondent.

---

ON PETITION FOR A WRIT OF CERTIORARI
TO THE SUPREME COURT OF THE STATE OF NEW YORK,
APPELLATE DIVISION, SECOND JUDICIAL DEPARTMENT

---

RESPONDENT'S BRIEF IN OPPOSITION

---

ERIC GONZALEZ
District Attorney
Kings County

LEONARD JOBLOVE*
JEAN M. JOYCE
Assistant District Attorneys

Kings County District Attorney's Office
350 Jay Street
Brooklyn, New York  11201-2908
jobloveL@brooklynDA.org
(718) 250-2511

*Counsel of Record for the Respondent

January 7, 2020

[ A101 ]

## QUESTION PRESENTED

Whether William Alexander's petition for certiorari should be denied because:

(1)   the decision of the New York State intermediate appellate court in this case does not present an important, unsettled question of federal law, does not conflict with any decision of this Court, and is correct under well-established principles of law;

(2)   even if the evidentiary ruling at issue was erroneous, the error was not of constitutional magnitude and was, in any event, harmless beyond a reasonable doubt; and

(3)   under these circumstances, summary reversal, which Alexander urges, is unwarranted.

ii

## PARTIES TO THE PROCEEDING

The petitioner in this Court is William Alexander, who was convicted after trial in a New York state court of robbery and criminal possession of a weapon.  The respondent is the State of New York, which is represented in this case by Eric Gonzalez, the District Attorney of Kings County, New York.

iii

## TABLE OF CONTENTS

Page

QUESTION PRESENTED ............................................... i

PARTIES TO THE PROCEEDING ....................................... ii

TABLE OF AUTHORITIES ........................................... iv

OPINION BELOW .................................................. 2

JURISDICTIONAL STATEMENT ....................................... 2

CONSTITUTIONAL PROVISIONS INVOLVED ............................. 2

STATEMENT OF THE CASE .......................................... 3
        The Trial ................................................ 3
                Defendant's Attempts to Admit the Arrest
                   Photograph into Evidence .......................... 7
                Defendant's Argument and the Court's Ruling ......... 8
                The Defense Summation ............................. 9
        The Verdict and the Sentence ........................... 10
        The Appeal ............................................. 10

REASONS WHY THE PETITION SHOULD BE DENIED .................... 12

I.    This Case Presents No Issue of National Importance
      and No Other Compelling Reason that Would Warrant
      Granting the Petition for Certiorari. ................... 13

II.   The Exclusion of Defendant's Arrest Photograph
      Pursuant to State Evidentiary Principles Was
      Constitutional. ........................................ 14

III. Any Constitutional Error in the Evidentiary Ruling
      Was Harmless. .......................................... 23

CONCLUSION .................................................... 27

[ A104 ]

iv

TABLE OF AUTHORITIES

Page

Cases

Chambers v. Mississippi, 410 U.S. 284 (1973) .............. 14, 15

Chapman v. California, 386 U.S. 18 (1967) ..................... 25

Crane v. Kentucky, 476 U.S. 683 (1986) ........................ 15

Delaware v. Van Arsdall, 475 U.S. 673 (1986) ................. 25

Holmes v. South Carolina, 547 U.S. 319 (2006) ............. 14, 16

Michigan v. Fisher, 558 U.S. 45 (2009) ....................... 13

Michigan v. Lucas, 500 U.S. 145 (1991) ....................... 15

People v. Alexander, 170 A.D.3d 738, 93 N.Y.S.3d 608
    (App. Div. 2019)....................................... 2, 11

People v. Alexander, 33 N.Y.3d 1066, 105 N.Y.S.3d 1
    (2019) .................................................... 11

People v. Davis, 43 N.Y.2d 17, 400 N.Y.S.2d 735 (1977) ........ 15

Rock v. Arkansas, 483 U.S. 44 (1987) .......................... 15

Sears v. Upton, 561 U.S. 945 (2010) ........................... 13

Sexton v. Beaudreaux, 138 S. Ct. 2555 (2018) .................. 13

Taylor v. Illinois, 484 U.S. 400 (1988) ................... 14, 16

United States v. Scheffer, 523 U.S. 303 (1998) ........... 21, 23

Constitutional Provisions

U.S. Const. amend. VI ...................................... 2, 14

U.S. Const. amend. XIV ..................................... 2, 14

[ A105 ]

v

<u>TABLE OF AUTHORITIES</u> (cont'd)

<u>Page</u>

<u>Statutes and Rules</u>

28 U.S.C. § 1257 .............................................. 2

N.Y. Penal Law § 160.15 ...................................... 10

N.Y. Penal Law § 265.03 ...................................... 10

Fed. R. Evid. 403 ......................................... 15, 16

Sup. Ct. R. 10 ............................................... 13

No. 19-6063

---

IN THE

SUPREME COURT OF THE UNITED STATES

---

WILLIAM ALEXANDER,

Petitioner,

v.

NEW YORK,

Respondent.

---

ON PETITION FOR A WRIT OF CERTIORARI
TO THE SUPREME COURT OF THE STATE OF NEW YORK,
APPELLATE DIVISION, SECOND JUDICIAL DEPARTMENT

---

RESPONDENT'S BRIEF IN OPPOSITION

---

The State of New York requests that this Court deny William Alexander's petition for a writ of certiorari, in which he seeks review of an order of the Supreme Court of the State of New York, Appellate Division, Second Judicial Department, that affirmed Alexander's judgment of conviction for robbery and criminal possession of a weapon.

[ A107 ]

## OPINION BELOW

The opinion of the Supreme Court of the State of New York, Appellate Division, Second Judicial Department, is reported at 170 A.D.3d 738, 93 N.Y.S.3d 608 (App. Div. 2019).  That opinion is reproduced in the appendix to the petition for certiorari.

## JURISDICTIONAL STATEMENT

The order of the Supreme Court of the State of New York, Appellate Division, Second Judicial Department, was entered on March 6, 2019.  The order of a judge of the New York Court of Appeals, denying Alexander permission to appeal to that court, was entered on June 27, 2019.  The petition for certiorari was timely filed in this Court on September 23, 2019.  This Court's jurisdiction is invoked under 28 U.S.C. § 1257(a).

## CONSTITUTIONAL PROVISIONS INVOLVED

United States Constitution, Sixth Amendment:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . .

United States Constitution, Fourteenth Amendment:

> No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . .

## STATEMENT OF THE CASE

### The Trial

The petitioner, William Alexander ("defendant"), was tried before a jury in the New York Supreme Court, Kings County, for the gunpoint robbery, in broad daylight, of the complainant. The trial evidence included the identifications of defendant as the assailant, minutes after the crime, by the complainant and a Good-Samaritan eyewitness. The eyewitness, accompanied by the complainant, followed defendant by car as he fled the scene on a bicycle, and the eyewitness reported defendant's location to the police on a recorded 911 call.

The evidence showed that on December 29, 2012, at approximately 1:55 p.m., a black man in a bright yellow "hoodie" and a blue vest, riding a small bicycle, approached the complainant, who was walking home on Atlantic Avenue, in Brooklyn (31–33, 38–42, 50–53).[1] The man, whom the complainant identified in court as defendant, said "give me money, give me the money," pulled out a gun, and pointed it at the complainant (32–34, 36–37, 40–41). The complainant opened her purse and gave defendant

---

[1] Numbers in parentheses followed by the letter "a" refer to pages of the appendix filed in this Court. Unprefixed numbers in parentheses refer to pages of the trial transcript, which was part of the record on appeal.

4

her money -- a $20 bill and two $10 bills.  Defendant grabbed at the complainant's purse, but she held onto it (34-35).

Meanwhile, the eyewitness was driving his minivan down Atlantic Avenue, when he saw a man -- defendant -- shoving something into a woman's chest; the woman looked terrified (50, 57, 60, 66-67).  The eyewitness stopped his car and defendant let the complainant go, jumped on his bicycle, and pedaled away (50-52, 58-60).

The eyewitness offered to help the complainant, who got into the eyewitness's car.  They circled the block and began following defendant from about a block away, and the eyewitness called 911 (35-36, 43-44, 53-55, 61; People's Exhibit 1 [recording of 911 call]).  The eyewitness told the 911 operator that a black man on a bicycle wearing a yellow hoodie and a blue vest had robbed a woman at gunpoint (54, 65; People's Exhibit 1).[2]  The eyewitness told the 911 operator where defendant was going, block by block (54-55, 62-63, 65; People's Exhibit 1).

At some point, defendant veered off (54, 63-64).  The eyewitness spotted a police car, so he drove up and told the officers

_____

[2] In the petition for certiorari, counsel asserts that, at trial, both the complainant and the eyewitness described the robber as "appearing to be a teenager" (Petition at 4), but that assertion is incorrect.  In fact, neither witness gave that description. The complainant estimated the age of the robber to be "[a]lmost 30, 20 something" (41); and the eyewitness answered "Yes" when asked if, in his 911 call, he described the robber as being "in his 20s" (65).

5

what was happening (54, 63-64). The eyewitness kept driving around and spotted defendant again, but could not follow him without going against traffic (54, 64-66).

At 2:02 p.m., Police Officer Remel Thomas received a radio call describing a gunpoint robbery by a black man, on a bicycle, wearing a yellow hoodie, a blue vest, and blue jeans (73, 103). One minute later, Officer Thomas saw a man on a bicycle, who matched that description, ride right past him (73-74, 103). The man, who made eye contact with Officer Thomas, was wearing a yellow hoodie, a blue vest, and blue jeans (73-74). Officer Thomas turned on his turret lights and pursued the man, "never los[ing] sight of him" (73-74).

The man, whom the officer identified in court as defendant, jumped off his bicycle and threw a gun to the ground (74-76, 104). Officer Thomas's partner, Police Officer Lisette Jordan, drew her weapon, and defendant put his hands up (70, 75, 78-79, 104). Officer Thomas handcuffed and searched defendant and recovered on his person one $20 bill and two $10 bills (79, 84-85 [12a-13a], 104; People's Exhibit 3 [photocopy of U.S. currency]). A loaded handgun was recovered from the sidewalk, approximately four feet away from

6

defendant (86, 101, 105 [17a]; People's Exhibit 4 [gun]).[3]

Meanwhile, the 911 operator called the eyewitness back and said that the police were looking for him (65-66). Officers in a patrol car directed the eyewitness to go to a specified location (54, 66). Upon arriving there, the complainant immediately identified defendant as the person who had robbed her (36-37).

Subsequently, Officers Thomas and Jordan brought defendant to the police precinct, and Officer Jordan, as the arresting officer, completed the arrest report and the complaint report (86-87, 105). An arrest photograph was taken of defendant at the precinct on the same day, but, in the photograph, defendant was wearing different clothing than he had been wearing at the time of his arrest (105-06 [17a-18a], 115 [24a]).

The People declined to call Officer Jordan to testify at trial, largely because she had an open criminal case in another county in which she was charged with misdemeanor assault (92-93, 111, 144-45 [48a-49a]). Defense counsel initially stated that the

---

[3] A witness who was a DNA expert analyzed DNA that was recovered from a swab taken from the trigger or trigger guard of the gun. The witness determined that the swab presented a DNA mixture to which three or more individuals had contributed, and concluded that it was 367 times more likely that the DNA mixture obtained from that swab was from three unknown, unrelated contributors than from defendant and two unknown, unrelated contributors (190-94). The witness explained, however, that, for a number of reasons, a person could have touched the gun but not left enough DNA to be detected (223-28).

[A112]

7

defense intended to call Officer Jordan as a witness "so that we can put the mugshot photo into evidence" (137-38 [41a-42a]), noting that Officer Jordan "was the one who had custody of the defendant" (138-39 [42a-43a]). Defense counsel subsequently interviewed Officer Jordan and declined to call her as a witness (96-97, 133 [37a], 149-52 [53a-56a], 172 [62a]). But defense counsel requested a missing witness instruction regarding the People's failure to call Officer Jordan, and the court granted that request and gave such an instruction to the jury (152 [56a], 173 [63a], 254-58, 320-21).

### Defendant's Attempts to Admit the Arrest Photograph into Evidence

During cross-examination of the eyewitness, defense counsel showed him defendant's arrest photograph (which had been marked as Defendant's Exhibit A for identification) (67). The eyewitness testified that he recognized the person in the photograph as the suspect, noting: "[B]ut that is not the clothes he was wearing. Absolutely not the clothes he was wearing, unless he changed somehow. He had a yellow. It is a big difference from yellow to that color. It was yellow, and a blue vest actually" (67).

The court asked the eyewitness whether he had identified defendant based upon what the police had told him, and the eyewitness replied unequivocally that he identified defendant because the

[ A113 ]

eyewitness had recognized him (68). The eyewitness testified that defendant had been wearing a yellow hooded sweatshirt and a blue sleeveless vest, that he had been riding a small bicycle, and that, as the eyewitness was driving around, he had not seen anyone else matching defendant's description (67-69).

Defense counsel also showed Officer Thomas the arrest photograph, which, Officer Thomas testified, was taken at the precinct on the day of defendant's arrest (105-06 [17a-18a], 115 [24a]). Officer Thomas testified that he recognized the person in the photograph to be defendant, but stated that defendant was "wearing different clothes" and "was wearing multiple clothes that he could have exchanged" (105-06 [17a-18a]).

Defendant's Argument and the Court's Ruling

Defense counsel asked to move the photograph into evidence, arguing that it could establish mistaken identification, in that the clothing defendant was wearing in the photograph differed from what the actual perpetrator was wearing at the time of the robbery (108 [20a]). The trial court noted that "three separate witnesses all indicated at the scene of the arrest the clothing he [defendant] had worn, and two of them looked at this [photograph] and said that's him, but his clothing has been changed" (113 [22a]). The court stated that if defendant proffered "some kind of sponsoring testimony that this was the clothing that he was wearing and they

[ A114 ]

9

arrested the wrong guy," the court would admit the photograph into evidence (108-09 [20a-21a], 113 [22a]).  The court later observed that admitting the photograph would allow the prosecution, on rebuttal, to elicit testimony regarding the clothing worn by "every person that was arrested in that precinct" (138 [42a]).

Before the defense case, defendant once again sought to admit the arrest photograph into evidence (168-72 [58a-62a]).  The trial court stated that the defense had failed to lay a proper foundation for the photograph's admission and that the photograph was irrelevant, because, "without knowing the time" when the photograph had been taken, the defense argument regarding the clothes that defendant was wearing in the photograph would "cause[] the jury to speculate" (167-68 [57a-58a], 171-72 [61a-62a]).  The court stated that the defense could still "try to find some way to put that photograph into evidence" with a proper foundation (172 [62a]).

The Defense Summation

On summation, defense counsel discussed, at length, the testimony of Officer Thomas and of the eyewitness that the clothing that defendant was wearing in his arrest photograph was significantly different from the clothing that the complainant and the eyewitness said the robber wore (264-65, 270-74).  Defense counsel noted that while the clothing worn by the robber "is supposed to be a blue ski vest, a hoodie, yellow, bright yellow hoodie,"

"[w]e know that when Mr. Alexander [defendant] was photographed at the precinct shortly after his arrest, that was not the color of the clothing that he was wearing" (265); and counsel further noted that the eyewitness stated in his 911 call that the man whom he was chasing wore a yellow hoodie, but "that testimony does not match up with what we know about how Mr. Alexander appeared in his arrest photo at the precinct" (269-71).

Relying in large part on that disparity between the description of the robber's clothing given by the witnesses and the clothing that defendant was wearing in his arrest photograph, counsel argued to the jury that defendant had been misidentified as the robber.

The Verdict and the Sentence

On December 3, 2014, defendant was convicted of Robbery in the First Degree (N.Y. Penal Law § 160.15[4]) and Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03[3]). On December 23, 2014, defendant was sentenced, as a second violent felony offender, to concurrent prison terms of twenty-five years on the robbery count and fifteen years on the weapon possession count, plus five years of post-release supervision on each count.

The Appeal

Defendant appealed from his judgment of conviction to an intermediate appellate court, the Supreme Court of the State of New

11

York, Appellate Division, Second Judicial Department.   On that appeal, defendant claimed, in relevant part, that the trial court's decision not to admit the arrest photograph into evidence deprived him of his right to present a defense under the Sixth and Fourteenth Amendments of the United States Constitution, and that the alleged error was not harmless beyond a reasonable doubt.

On March 6, 2019, the Appellate Division affirmed defendant's judgment of conviction (1a-2a).   People v. Alexander, 170 A.D.3d 738, 93 N.Y.S.3d 608 (App. Div. 2019).   The Appellate Division concluded that the trial court providently exercised its discretion in excluding the photograph from evidence, because defendant failed to lay a sufficient foundation for its admission.   The Appellate Division further held that, in any event, even if erroneous, the failure to admit the photograph was harmless, because the proof of defendant's guilt was overwhelming and there was no significant probability that, had the photograph been admitted, the jury would have acquitted defendant (1a).   170 A.D.3d at 739, 93 N.Y.S.3d at 609.

In an order dated June 27, 2019, a judge of the New York Court of Appeals denied defendant's application for permission to appeal to that court from the order affirming the judgment of conviction (71a).   People v. Alexander, 33 N.Y.3d 1066, 105 N.Y.S.3d 1 (2019).

[ A117 ]

REASONS WHY THE PETITION SHOULD BE DENIED

In his petition for certiorari, defendant challenges the trial court's evidentiary ruling that he failed to lay a proper foundation to admit his arrest photograph into evidence, and claims that this ruling deprived him of his constitutional right to present a defense.  Defendant contends that his case is "ideal for summary treatment" (Petition at 2).  But summary reversal is unwarranted, because defendant's claim of a constitutional violation is meritless.

Defendant's petition for certiorari should be denied for three reasons.  First, defendant has not identified any issue of national importance presented by the holding of the Appellate Division in this case, and instead he apparently seeks only summary review.  Second, the evidentiary ruling at issue complied with the requirements of the Constitution.  Third, in any event, any error was harmless beyond a reasonable doubt.

13

I.   <u>This Case Presents No Issue of National Importance and No Other Compelling Reason that Would Warrant Granting the Petition for Certiorari</u>.

Defendant's petition for certiorari should be denied.  His petition does not present an "important" federal question decided by the Appellate Division in a way that conflicts with a decision of this Court, of any federal court of appeals, or of any state court of last resort.  <u>See</u> Sup. Ct. R. 10(b), (c).

Defendant seeks summary reversal (<u>see</u> Petition at 2, 9, 12), but summary reversal is not warranted here.   The Appellate Division's decision in this case was correct, and thus it does not present a clear constitutional error that could justify summary reversal.  <u>Cf</u>. <u>Sexton v. Beaudreaux</u>, 138 S. Ct. 2555, 2560 (2018) (per curiam) (granting summary reversal where lower court's opinion "was not just wrong," but also "committed fundamental errors that this Court has repeatedly admonished courts to avoid"); <u>Sears v. Upton</u>, 561 U.S. 945, 946 (2010) (per curiam) (granting summary reversal where "it is plain from the face of the state court's opinion" that state court failed to apply correct constitutional standard established by this Court); <u>Michigan v. Fisher</u>, 558 U.S. 45, 51-52 (2009) (Stevens, J., dissenting) ("it is hard to see how this Court is justified in micromanaging the day-to-day business of state tribunals making fact-intensive decisions").

[A119]

14

II.  The Exclusion of Defendant's Arrest Photograph Pursuant to State Evidentiary Principles Was Constitutional.

Defendant's petition for certiorari should be denied because New York's rule authorizing a court to exclude relevant evidence at trial if its probative value is outweighed by certain other considerations -- as that rule was applied in this case -- is a reasonable restriction on the right to present relevant evidence. The trial court properly applied that evidentiary rule in declining to admit defendant's arrest photograph into evidence.  Moreover, even if the evidentiary ruling was erroneous, that ruling did not violate defendant's constitutional right to present a defense.

A criminal defendant's right to present a complete defense at trial is a fundamental element of due process arising from both the Sixth and Fourteenth Amendments of the United States Constitution.  See U.S. Const. amends. VI, XIV; Chambers v. Mississippi, 410 U.S. 284, 294-95, 302 (1973).  The right to present evidence, however, is subject to reasonable restrictions, which may constitutionally authorize the exclusion of evidence "under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988).  States have considerable latitude under the Constitution to establish rules that exclude evidence from criminal trials.  See Holmes v. South Carolina, 547 U.S. 319, 324 (2006).  Those rules do not curtail an accused's right to present

15

a defense, as long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." Rock v. Arkansas, 483 U.S. 44, 56 (1987); see also Michigan v. Lucas, 500 U.S. 145, 149 (1991); Chambers, 410 U.S. at 295.   This Court has been "traditional[ly] reluctan[t] to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." Crane v. Kentucky, 476 U.S. 683, 689 (1986).

In New York, a trial court has the discretion to exclude evidence, even if that evidence may be minimally relevant, "if its probative value is outweighed by the danger that its admission would prolong the trial to an unreasonable extent without any corresponding advantage; or would confuse the main issue and mislead the jury; or unfairly surprise a party; or create substantial danger of undue prejudice to one of the parties." People v. Davis, 43 N.Y.2d 17, 27, 400 N.Y.S.2d 735, 740 (1977) (quotation marks and citations omitted).   That evidentiary rule is neither arbitrary nor disproportionate to the purpose it is designed to serve.   Indeed, that rule is substantially similar to Rule 403 of the Federal Rules of Evidence, which is entitled, "Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons," and which states:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the

[ A121 ]

16

issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403.

The evidentiary ruling at issue in this case did not violate any constitutional principle and does not requires this Court's attention.   The trial court applied "standard rules of evidence" concerning admissibility (see Taylor, 484 U.S. at 410) when it weighed the limited probative value of the arrest photograph against the adverse risks that would arise from its presentation to the jury.   See Holmes, 547 U.S. at 326 ("well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury" [citing, inter alia, Fed. R. Evid. 403]).

Three factors support the propriety of the trial court's ruling to exclude the arrest photograph.   First, the trial court apparently, and reasonably, concluded that, in the absence of a proper foundation regarding the time of the taking of the arrest photograph and the circumstances of defendant's custody until that time, admitting the photograph would have left the jury to speculate as to how much time passed from when defendant was arrested until the photograph was taken and what opportunities defendant might have had during that time to exchange his clothes

17

with another person who was in custody at the precinct (167-68 [57a-58a], 171-72 [61a-62a]). Officer Thomas testified that the arrest photograph of defendant was taken at the precinct on the day of his arrest (105-06 [17a-18a], 115 [24a]) -- and that the arrest occurred shortly after 2:00 p.m. (72, 103) -- but he did not testify that he was present when the photograph was taken, or that he knew at what time it was taken, or that he knew what opportunities defendant might have had to exchange his clothes with someone else before the photograph was taken.

Second, the trial court noted that admitting the arrest photograph would have risked unnecessarily prolonging the trial, by opening the door for the prosecution, on rebuttal, "to bring in testimony as to every person that was arrested in that precinct" and "the clothing that that person had," thus potentially creating "a trial within a trial" (138 [42a]).

Third, the testimony of Officer Thomas showed that the arresting officer -- Officer Jordan -- had taken the photographs of the bicycle and the gun that were recovered, and had made the photocopy of the currency that was recovered (77 [9a], 79-83, 87 [15a]), and that she had completed the police reports (105 [17a]). Thus, there was reason to believe that Officer Jordan could provide additional information regarding the circumstances surrounding the taking of the arrest photograph. Defense counsel initially stated

18

that the defense intended to call Officer Jordan as a witness, in order to seek to put the arrest photograph into evidence (133-39 [37a-43a]), and defense counsel subsequently interviewed Officer Jordan. But, despite the court's invitation to defense counsel that "[y]ou can certainly again try to find some way to put that photograph into evidence . . . if you have a proper foundation" (172 [62a]), counsel ultimately decided not to call Officer Jordan to testify. Instead, defense counsel requested (and the court gave the jury) a missing witness instruction regarding the prosecution's failure to call that officer (172-73 [62a-63a]); and, in summation, counsel took the prosecution to task for not calling Officer Jordan as a witness, arguing that Officer Jordan "had eyes on him [defendant] the whole time" he was in police custody and that she therefore was "the person who could best address the issue of the arrest photo" (272-74).

Defendant contends that the arrest photograph "contradicts all eyewitness testimony" (Petition at i) and that it "irrefutably show[s] that [defendant] was not, on the day in question, the man wearing the bright yellow hoodie and blue vest" (id. at 5). Those contentions are patently meritless. There is no contradiction between, on the one hand, the testimony that showed that defendant was wearing a yellow hoodie and a blue vest at the time of the robbery and at the time of the arrest; and, on the other hand, the

[ A124 ]

arrest photograph, which showed that defendant was wearing different clothing at whatever later time that photograph was taken, by which time he could have changed his outerwear.

Similarly, defendant asserts that "the robber was never out of sight long enough to have performed a miraculous wardrobe change" (id. at 11). But, in the absence of any evidence regarding the time when the photograph was taken and the circumstances of defendant's custody until that time, that assertion is utterly unsupported by the record and rests on speculation.

Contrary to defendant's suggestion (see Petition at 7 n.3), it is irrelevant to the propriety of the evidentiary ruling at issue that Officer Jordan stated that she would have invoked her Fifth Amendment privilege if called to testify in this case. Officer Jordan made that statement, after the defense had rested, during an inquiry by the court to determine whether she had been available to testify and whether the defense request for a missing witness instruction therefore should be granted (241-42 [69a-70a]). The court ultimately granted the defense request and gave a missing witness instruction, and thus the court apparently found that Officer Jordan was available to testify and that she would have invoked the privilege only with respect to her own pending case. Moreover, before the defense case, when defense counsel stated that the defense would not call Officer Jordan as a witness

in an attempt to lay a foundation for introducing the arrest photograph, counsel never cited, as a reason for not calling the officer, that her anticipated invocation of the privilege would render her testimony unavailable (see 167-72 [57a-62a]); and, later, in support of the defense request for a missing witness instruction and on summation, counsel instead argued the opposite position -- namely, that the officer's testimony was available.

Consequently, it was entirely reasonable for the trial court to rule that, in order to introduce the photograph, the defense needed to lay a foundation by showing the time when the photograph was taken and the circumstances of defendant's custody until that time, so that the jury could intelligently weigh the plausibility of the proffered defense theory -- which was that the clothing that defendant was wearing in the photograph was the same clothing in which he had been arrested, and that the complainant, the eyewitness, and Officer Thomas were all "misremembering" what defendant was wearing at the time of his arrest (142-43 [46a-47a]) -- against the plausibility of the explanation that defendant had exchanged his outerwear with someone else at the precinct by the time the photograph was taken.

In any event, the trial court's evidentiary ruling did not violate defendant's constitutional right to present a defense. This Court has held that exclusions of evidence were unconstitutional

21

when they "significantly undermined fundamental elements of the
defendant's defense." United States v. Scheffer, 523 U.S. 303, 315
(1998). In this case, the ruling at issue did not have that effect,
because defense counsel elicited testimony that allowed counsel to
make essentially the same argument to the jury that counsel could
have made if the photograph itself had been admitted.

In the presence of the jury, two witnesses -- the eyewitness
and Officer Thomas -- were shown the arrest photograph and testified
unequivocally that the clothing that defendant was wearing in the
photograph was different from the clothing that he had been wearing
at the time of the crime and the arrest.   Upon viewing the
photograph, the eyewitness testified that the clothes that defendant
was wearing in the photograph were "[a]bsolutely not" the clothes
he had been wearing earlier, and that there was "a big difference"
between the yellow clothing that he had been wearing earlier and
the color of the clothes shown in the photograph (67). When defense
counsel showed the photograph to Officer Thomas, he testified, three
times, that defendant was wearing different clothes (105-06 [17a-
18a]).

During her summation, defense counsel capitalized on this
testimony. Defense counsel reminded the jury that Officer Thomas
had been shown the photograph during cross-examination, and
counsel noted that while the clothing worn by the robber "is

supposed to be a blue ski vest, a hoodie, yellow, bright yellow hoodie," "[w]e know that when Mr. Alexander [defendant] was photographed at the precinct shortly after his arrest, that was not the color of the clothing that he was wearing" (265). Defense counsel similarly mentioned that the eyewitness had also been shown the photograph during cross-examination. Counsel noted that the eyewitness stated in his 911 call that the man whom he was chasing wore a yellow hoodie, but counsel, quoting the eyewitness's testimony, emphasized, four times, that there was a "big difference" between the yellow hoodie that the eyewitness described in his 911 call and the color of the clothing that defendant was wearing in the photograph (270-72). Defense counsel maintained that the police had simply stopped the wrong man riding a bicycle in the vicinity of the crime -- defendant -- and that the complainant misidentified defendant as her assailant (271).

Thus, the argument that counsel sought to advance by introducing the arrest photograph -- namely, the argument that the difference between the description of the robber's clothing given by the witnesses and the clothing that defendant was wearing in his arrest photograph supported the theory that defendant had been misidentified as the robber -- was put before the jury. Therefore, the court's ruling excluding the photograph did not "significantly undermine[] fundamental elements of the defendant's defense" and

23

did not violate his constitutional right to present a defense. See <u>Scheffer</u>, 523 U.S. at 315.

Moreover, contrary to defendant's contention (Petition at 8, 10-12), there was no "disparate treatment" of the parties with respect to the introduction of photographs.  The photograph of the bicycle was admitted into evidence because Officer Thomas testified that the photograph accurately depicted what defendant's bicycle looked like on the day of his arrest (76-78 [8a-10a]), and the photocopy of the currency was similarly admitted because Officer Thomas testified that the photocopy accurately depicted the money that he recovered from defendant (83-85 [11a-13a]).  But, by contrast, Officer Thomas did not testify that he ever saw defendant in the clothes depicted in the arrest photograph, or that he knew at what time the photograph was taken, or that he knew what opportunities defendant might have had to exchange his clothes with someone else before the photograph was taken.  Thus, the arrest photograph was excluded because the necessary foundation was lacking, not because of any alleged disparate treatment.

III. <u>Any Constitutional Error in the Evidentiary Ruling Was Harmless</u>.

The petition for certiorari should be denied for the additional reason that, even if the evidentiary ruling at issue

24

were held to be unconstitutional, any such constitutional error would be harmless, in light of the strength of the prosecution's case and the minimal impact of the ruling at issue on defendant's ability to present his defense.

The evidence of defendant's guilt was overwhelming. Defendant was apprehended and identified just eight minutes after the commission of the gunpoint robbery of the complainant during daylight hours. Both the complainant and an eyewitness promptly identified defendant, and both witnesses recognized the yellow hooded sweatshirt and the blue vest that the robber had been wearing. Defendant threw a gun to the ground when he was confronted by the police. In addition, the police recovered from defendant one $20 bill and two $10 bills, which matched the number of bills and the denominations of the bills taken from the complainant.

Furthermore, during the trial, defense counsel was able to show the arrest photograph to two witnesses -- the eyewitness and Officer Thomas -- and to elicit from both of those witnesses unequivocal testimony that the clothing that defendant was wearing in the photograph was different from the clothing that he had been wearing at the time of the arrest. Relying on that testimony, counsel argued at length on summation that the difference between the description of the robber's clothing given by the witnesses

and the clothing that defendant was wearing in his arrest photograph supported the theory that defendant had been misidentified as the robber.  In light of that testimony regarding the clothing that defendant was wearing in his arrest photograph, and in light of defense counsel's reliance on that testimony in summation, the exclusion of the photograph itself had little or no effect on the argument that counsel was able to make to the jury, because the photograph would have been largely cumulative of the testimony that the clothing defendant was wearing in the photograph was different from the clothing he was wearing at the time of his arrest.

Under these circumstances, there is no reasonable possibility that the introduction of the arrest photograph would have changed the verdict.   Consequently, any constitutional error in the exclusion of that photograph was harmless beyond a reasonable doubt.   See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986) (harmless-error analysis applies to exclusion of evidence in violation of Confrontation Clause); Chapman v. California, 386 U.S. 18, 24 (1967) (for federal constitutional error to be held harmless, it must be harmless beyond a reasonable doubt).

\*        \*        \*

Accordingly, in the absence of any basis to conclude that the evidentiary ruling at issue violated the Constitution, let alone

26

that it would require reversal of defendant's conviction, this case does not warrant review by this Court.

27

<u>CONCLUSION</u>

<u>THE PETITION FOR A WRIT OF CERTIORARI SHOULD
BE DENIED</u>.


                    Respectfully submitted,


                    ERIC GONZALEZ
                    District Attorney
                    Kings County


                    LEONARD JOBLOVE*
                    JEAN M. JOYCE
                    Assistant District Attorneys

                    Kings County District Attorney's Office
                    350 Jay Street
                    Brooklyn, New York  11201-2908
                    jobloveL@brooklynDA.org
                    (718) 250-2511

                    *Counsel of Record for the Respondent


January 7, 2020

No. 19-6063

# In the
# Supreme Court of the United States

WILLIAM ALEXANDER,

*Petitioner,*

*v.*

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent.*

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE SUPREME COURT OF THE STATE OF NEW YORK,
APPELLATE DIVISION, SECOND DEPARTMENT*

## REPLY TO STATE'S BRIEF IN OPPOSITION

Alan S. Axelrod
  *Counsel of Record*
Will A. Page*
LEGAL AID SOCIETY
  CRIMINAL APPEALS BUREAU
199 Water Street, 5th Floor
New York, New York 10038

  * Admitted in N.Y. and
    the Second Circuit

*Counsel for Petitioner*

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................... ii

REPLY TO STATE'S BRIEF IN OPPOSITION ...... 1

    Respondent's Position That The Prosecution's One-Sided Theory Justified Excluding Presentation Of Petitioner's Equally, If Not More, Plausible Theory Of Misidentification Via His Arrest Photo, Underscores That Mr. Alexander's Constitutional Right To Present A Complete Defense Was Violated. ....... 1

CONCLUSION ......................................................... 7

ii

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Youngblood*,
  488 U.S. 51 (1988) ............................................ 7

*Bell v. Poole*,
  No. 00 Civ. 5214 (ARR),
  (E.D.N.Y. Apr. 10, 2003) ................................. 2

*Chambers v. Mississippi*,
  410 U.S. 284 (1973) ......................................... 5

*Darden v. Wainwright*,
  477 U.S. 168 (1986) ......................................... 4

*Dey v. Scully*,
  952 F. Supp. 957 (E.D.N.Y. 1997) .................. 2

*Holmes v. South Carolina*,
  547 U.S. 319 (2006) ...................................... 4-5

*People v. Price*,
  29 N.Y.3d 472 (2017) ...................................... 2

*People v. Slavin*,
  1 N.Y.3d 392 (2004),..................................... 3-4

*Schweiker v. Hansen*,
  450 U.S. 785 (1981) ......................................... 6

## REPLY TO STATE'S BRIEF IN OPPOSITION
## TO PETITION FOR A WRIT OF CERTIORARI

Respondent's Position That The Prosecution's One-Sided Theory Justified Excluding Presentation Of Petitioner's Equally, If Not More, Plausible Theory Of Misidentification Via His Arrest Photo, Underscores That Mr. Alexander's Constitutional Right To Present A Complete Defense Was Violated.

As respondent's opposition makes clear, the critical facts are not in dispute.[1] What is disturbing is how respondent addresses the fact that Mr. Alexander's clothes in his arrest photo (Pet. at 3; 72a), did not match those of the robbery suspect.

Rather than acknowledging that this major discrepancy was indeed relevant, probative, and highly exculpatory, respondent clings to the speculation used by the trial court as an excuse to deny the introduction of the photo in the first place. Respondent posits that the police-generated photograph could never be admitted because there is no sensible way to

---

[1] The robbery suspect wearing the bright yellow hoodie and blue vest was chased from the scene, (Opp. at 3-4); eventually spotted and pursued by NYPD Officer Thomas who "never los[t] sight of him," (*id.* at 5); until he was captured, arrested, and processed at the station, (*id.* at 5-6); and his photograph was taken "the same day," (*id.* at 6). Petitioner apologizes for transforming a "twenty-something" suspect into a teenager. (*See* Opp. at 4 n.2; *see also* Trial Tr. 65 ("Black man in his 20s").) The fact remains that Mr. Alexander's age was significantly higher—he was a 39-year-old man at the time of his arrest. (72a.)

2

prove or disprove whether Mr. Alexander changed his clothes in lock-up (Opp. at 16-17, 20), ignoring the other obvious exculpatory theory that Mr. Alexander, as so often occurs for black men, was misidentified.[2]

Indeed, the Appellate Division's decision, on review in this petition, found no analogue to support the proposition that mugshots become unreliable when they do not match the prosecution's theory of the case. (*See* 1a.)  Instead, the decision cited *People v. Price*, 29 N.Y.3d 472 (2017), a case where the prosecution was not allowed to present a photo found on the internet as a photo of the accused, due to the lack of foundation connecting the individual depicted to the defendant. *Id.* at 478-49.  It should be self-evident, however, that a police-generated mugshot, provided through discovery, is of a substantially higher quality and far more reliable than something downloaded off the internet. *Cf. id.* at 476 ("testimony establishing a chain of custody may suffice to demonstrate authenticity in other circumstances"); *People v. Slavin*, 1 N.Y.3d 392, 403

---

[2] Aside from common sense—which should tell us that lock-up is not a free-for-all where arrestees can exchange clothes with whomever they wish—there are a multitude of sources that explain the process by which arrestees are processed and photographed. *See, e.g.*, *Bell v. Poole*, No. 00 Civ. 5214 (ARR), n.1 (E.D.N.Y. Apr. 10, 2003) ("the mugshot pedigree form . . . contains color versions of both photographs taken at Central Booking"); *Dey v. Scully*, 952 F. Supp. 957, 965-66 (E.D.N.Y. 1997) ("arrestees [are] not allowed to receive visitors who might bring a change of clothing into the holding cells. . . . Moreover, throughout [] initial processing, [] arrestees [are] under constant observation by police officers[.]")

None of these sources suggest Mr. Alexander would have been free to don a new outfit while under constant surveillance.

3

(2004) ("arrest photographs" are "necessary for the administrative purpose of identifying those in the custody of the police."). This is particularly true, given that there was no disagreement that the arrest photo was of Mr. Alexander. (*See* Opp. at 6, 8.)

Thus, respondent hopes to obscure the absurdity of excluding the mugshot by justifying why the other police-generated photos *were* admissible. (Opp. at 23.) Yet, the trial court's handling of those photos only proves petitioner's point—that the photo was admissible, and any questions about it should have gone to its weight. Indeed, the only discernable reason for why the court denied the mugshot's admission was that the court had already credited the prosecution's theory of the case. (20a-21a.)

For starters, the court's treatment of the photograph of the money shows that foundation principles were understood and properly applied—when it came to evidence offered by the prosecution. Officer Thomas explained he had recovered the same amount of currency, as that pictured in the photo, from the individual arrested for the robbery. (11a, 13a.) But he did not know the specifics of the actual bills recovered, *i.e.*, their serial numbers, or what happened to them after he gave them to Officer Jordan. (12a.) Nevertheless, the court admitted the photo and said that his lack of knowledge went to the weight of the evidence rather than its admissibility. (13a.)

In contrast, the photo of the bicycle presents the more typical situation. Officer Thomas had seen the bike—and he agreed with how it was depicted in the photo. (9a-10a.) Therefore, even though the actual

4

photograph was taken by Officer Jordan, the photo was admitted. (*Id.*)

The only difference between the mugshot and the photo of the bicycle was Officer Thomas's statement that the clothing was different. (*See* 17a-20a; Opp. at 8.) Yet, that disagreement—particularly given Thomas's confirmation that the photo depicted Mr. Alexander (17a-18a)—should have gone to weight rather than admissibility, just like the photo of the money. But the trial court did not provide the defense with the same treatment that it provided the prosecution. When the court excluded the photo on Thomas's say-so alone, it improperly based its decision on "the strength of only one party's evidence[.]" *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006).

Given the dearth of credible reasons for excluding the mugshot, respondent also hopes to use defense counsel's argument on summation as a substitute for Mr. Alexander's right to present a defense through evidence. Respondent thus asserts that the jury understood the issues despite never seeing the photograph because defense counsel argued that when Mr. Alexander was "photographed at the precinct" the brightly colored outfit "was not the color of the clothing that he was wearing." (Opp. at 10.) But, as the jury was properly instructed, summations are not evidence. *See also Darden v. Wainwright*, 477 U.S. 168, 183 (1986) ("arguments [are] not evidence").

The jury needed to see that Mr. Alexander was wearing street clothes with a hood and a vest. And, they needed to see the stark difference in the colors,

5

to see and hear about the actual maroon and gray out-fit that Mr. Alexander was wearing.  Otherwise, the jury could never understand why this photo was crit-ical to Mr. Alexander's defense when all the jury heard was that he was wearing "different clothes" in his arrest photo.  (*See* Opp. at 7, 8.)[3]

For all they knew, he might have been wearing a jail jumpsuit in the photograph, since the defense could not show them the actual outfit and colors that were depicted.  And, in response, the prosecution would have been able to offer evidence to explain the stark difference between his outfit and the outfit de-scribed by the witnesses.

That is why the prosecution fought so hard to ex-clude this evidence at trial.  It was afraid of this pow-erful, exculpatory evidence and concerned that there was no credible way to prove the far-fetched theory that Mr. Alexander had somehow found extra clothes and changed into them while in lock-up.  But that is exactly why *Chambers* and *Holmes* say this type of evidence should not be excluded on the basis of tech-nical evidentiary rules.  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Holmes*, 547 U.S. at 324-27.

---

[3] Moreover, the defense would have been able to cross-ex-amine each witness, and impeach their credibility, regarding the inexplicable difference between the outfits.  Indeed, the defense might have been able to question the admissibility of the prior identifications, given that the eyewitness and the complainant both noted that they had recognized the man being arrested based on his clothing.  (Trial Tr. 37 ("I recognize[d] him by . . . the yellow jacket"); 55 ("I recognized him, the same clothes").)

6

Since the defense's argument was that the wrong person was charged with these crimes—and that the unique clothing of the perpetrator did not match Mr. Alexander's—this compelling misidentification evidence should have been admitted and examined for the benefit of the jury, as constitutionally required. That remains true even if the arresting officer, who processed the paperwork, is not readily available either due to her "open criminal case," (Opp. at 6), or due to her credibility problems. (*See* Pet. at 4 (discussing Officer Jordan's failure to provide an exclusionary DNA sample), 5 n.2 (discussing Jordan's false grand jury testimony, left unaddressed by respondent's opposition).) Given the defendant's constitutional right to present a defense, any questions about what transpired between arrest and photographing were for the jury to explore through weighing the evidence, not speculation.

In sum, petitioner agrees with respondent on the standard for summary reversal: "situations in which the law is settled and stable, the facts are not in dispute, and the decision below is clearly in error." *Schweiker v. Hansen*, 450 U.S. 785, 791 (1981) (Marshall, J., dissenting). All three conditions are present. As demonstrated by the petition and this reply, any contention that there was no constitutional error in this case does not fit the uncontested facts.[4]

---

[4] To the extent there are any questions requiring full-briefing, plenary review remains an option. *See Schweiker*, 450 U.S. at 791. It remains petitioner's position, however, that the exclusion of this photograph in a misidentification case is beyond clear error—and the harm is palpable.

7

"[T]here is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says, 'That's the one!'" *Arizona v. Youngblood*, 488 U.S. 51, 72 (1988) (Blackmun, J., dissenting).  Without the photograph, Mr. Alexander had little chance to counter that powerful, though demonstrably mistaken, evidence.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for a writ of certiorari.

Respectfully submitted,

Alan Axelrod /RJ
*Counsel of Record*
Will A. Page
LEGAL AID SOCIETY
    CRIMINAL APPEALS BUREAU
199 Water St. 5th Floor
New York, NY  10038
(212) 577-3470
AAxelrod@legal-aid.org

*Counsel for Petitioner*

January 17, 2020

(ORDER LIST: 589 U.S.)

**CERTIORARI -- SUMMARY DISPOSITIONS**

19-568          AZANO MATSURA, JOSE S. V. UNITED STATES

        The petition for a writ of certiorari is granted.  The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Ninth Circuit for further consideration in light of *Rehaif v. United States*, 588 U. S. ___ (2019).

19-6496         SMITH, DAVID E. V. UNITED STATES

        The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Fourth Circuit for further consideration in light of *Rehaif v. United States*, 588 U. S. ___ (2019).

19-6871         VAZQUEZ, JUSTIN V. UNITED STATES

        The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of *Rehaif v. United States*, 588 U. S. ___ (2019).

**ORDERS IN PENDING CASES**

19A721          POWE, WAYNE, ET UX. V. DEUTSCHE BANK NATIONAL TRUST CO.
(19-1024)
        The application for stay addressed to Justice Sotomayor and

        referred to the Court is denied.

19A728      PRATT, HENRY V. BARR, ATT'Y GEN.

        The application for stay of removal addressed to Justice Ginsburg and referred to the Court is denied.

19M95       HOLLAND, TYRONE W. V. KEMP, GOV. OF GA

        The motion to direct the Clerk to file a petition for a writ of certiorari out of time is denied.

19M96       KANEKA CORP. V. XIAMEN KINGDOMWAY GROUP, ET AL.

        The motion for leave to file a petition for a writ of certiorari under seal with redacted copies for the public record is denied.

19M97       ADAMS, BARTON J. V. UNITED STATES

        The motion for leave to file a petition for a writ of certiorari with the supplemental appendix under seal is denied.

19M98       IN RE TCT MOBILE INTERNATIONAL LIMITED

        The motion for leave to file a petition for a writ of mandamus with the supplemental appendix under seal is denied.

19M99       KAUR, RAMINDER V. MARYLAND

19M100     H. K. V. V. FL DEPT. OF CHILDREN, ET AL.

19M101     H. K. V. V. FL DEPT. OF CHILDREN, ET AL.

        The motions for leave to file petitions for writs of certiorari with the supplemental appendices under seal are granted.

19M102     KNOCHEL, JAMES J. V. MIHAYLO, EMILY N.

        The motion for leave to file a petition for a writ of certiorari under seal is denied.

18-1323  ) JUNE MEDICAL SERV., ET AL. V. RUSSO, SEC., LA DEPT. OF HEALTH
         )
18-1460  ) RUSSO, SEC., LA DEPT. OF HEALTH V. JUNE MEDICAL SERV., ET AL.

      The motion of Foundation for Life for leave to file a brief
as *amicus curiae* out of time is denied.

18-9526  McGIRT, JIMCY V. OKLAHOMA

19-199   SALINAS, MANFREDO M. V. RAILROAD RETIREMENT BOARD

      The motions of petitioners to dispense with printing the
joint appendices are granted.

19-251   ) AMERICANS FOR PROSPERITY V. BECERRA, ATT'Y GEN. OF CA
         )
19-255   ) THOMAS MORE LAW CENTER V. BECERRA, ATT'Y GEN. OF CA

      The Solicitor General is invited to file a brief in these
cases expressing the views of the United States.

19-438   PEREIDA, CLEMENTE A. V. BARR, ATT'Y GEN.

19-635   TRUMP, DONALD J. V. VANCE, CYRUS R., ET AL.

      The motions of petitioners to dispense with printing the
joint appendices are granted.

19-5299  ROSADO, SAMUEL R, V. LUCID ENERGY, INC.

      The motion of petitioner for reconsideration of order
denying leave to proceed *in forma pauperis* is denied.

19-6804  HELMS, MICHAEL V. WELLS FARGO BANK, ET AL.

19-6967  BOYD, MICHAEL E., ET AL. V. CA PUB. UTIL. COMM'N, ET AL.

19-7081  ADEBOWALE, ADEOYE O. V. WOLF, SEC. OF HOMELAND, ET AL.

19-7268  RUPAK, ACHARAYYA V. UNITED STATES

      The motions of petitioners for leave to proceed *in forma
pauperis* are denied.  Petitioners are allowed until March 16,
2020, within which to pay the docketing fees required by Rule
38(a) and to submit petitions in compliance with Rule 33.1 of
the Rules of this Court.

**CERTIORARI GRANTED**

19-123        FULTON, SHARONELL, ET AL. V. PHILADELPHIA, PA, ET AL.

              The petition for a writ of certiorari is granted.

19-9699       GARCIA, JOSE V. UNITED STATES

19-107        ASARO, VINCENT V. UNITED STATES

19-273        BINDAY, MICHAEL V. UNITED STATES

19-282        OLIVAS-MOTTA, MANUEL V. BARR, ATT'Y GEN.

19-284        MERCADO RAMIREZ, JOSE J. V. BARR, ATT'Y GEN.

19-347        AER ADVISORS, INC., ET AL. V. FIDELITY BROKERAGE SERVICES, LLC

19-389        DOBYNS, JAY A. V. UNITED STATES

19-433        SUTHERLAND, PATRICK E. V. UNITED STATES

19-475        KARINGITHI, SERAH N. V. BARR, ATT'Y GEN.

19-486        TAFFE, DONNETT M. V. WENGERT, GERALD E., ET AL.

19-488        WALTNER, STEVEN T., ET UX. V. CIR

19-527        HUSKISSON, PAUL V. UNITED STATES

19-541        LAMBERT, MICHAEL V. ESTATE OF KEVIN BROWN, ET AL.

19-569        AYESTAS, CARLOS M. V. DAVIS, DIR., TX DCJ

19-600        KRAKAUER, JON V. CHRISTIAN, CLAYTON T.

19-603        SILGUERO, MARK, ET AL. V. CSL PLASMA, INC.

19-609        SHEPHERD, ERIN J., ET AL. V. STUDDARD, ANGELA

19-619        CISCO SYSTEMS, INC. V. SRI INTERNATIONAL, INC.

19-669        WATKINS, MATTHEW T. V. SAUL, ANDREW M.

19-691        CLARK, ARTHUR L. V. GEORGIA

19-693        BALOV, PETER V. CALIFORNIA

19-694        BAKER, HEATHER V. TRENTON, MI, ET AL.

19-695        WEBB, DEAN B., ET AL. V. DEERE CREDIT, INC., ET AL.

19-698        NORA, WENDY A. V. MN OFFICE OF LAWYERS PROF'L

```
19-5568      NELSON, KEITH D. V. UNITED STATES

19-5784      VILLECCO, MICHAEL V. STARK, DANIEL W., ET AL.

19-5805      ALDISSI, MAHMOUD, ET UX. V. UNITED STATES

19-5829      CASTRO-LOPEZ, YONI V. UNITED STATES

19-5865      BALDERAS, PABLO S. V. UNITED STATES

19-5869      ENRIQUEZ-HERNANDEZ, JAIME V. UNITED STATES

19-5875      GONZALEZ-TERRAZAS, ALFREDO V. UNITED STATES

19-5905      DAVIS, RICKY V. UNITED STATES

19-5907      CASTANEDA-TORRES, LUIS V. UNITED STATES

19-5946      SPENCE, ANTHONY C. V. UNITED STATES

19-5979      LOZANO, RODRIGO P. V. UNITED STATES

19-6015      ARIAS-DE JESUS, ROQUE V. UNITED STATES

19-6037      ANZURES, JOHN V. UNITED STATES

19-6042      CORTES, GERARDO T. V. UNITED STATES

19-6086      TORRES, LUIS A. V. UNITED STATES

19-6087      MALIK, ATIF B. V. UNITED STATES

19-6095      FULTON, CHARLES D. V. UNITED STATES

19-6110      AYALA-GONZALEZ, ABIMAEL V. NEW YORK

19-6199      RAMIREZ, EMETERIO E. V. UNITED STATES

19-6200      SMITH, MICHAEL S. V. FLORIDA

19-6229      DOUGLAS, JOHN J. V. UNITED STATES

19-6252      RAMIREZ, EDINSON H. V. MARYLAND

19-6264      NELSON, ORANE V. UNITED STATES

19-6265      KNIGHT, ALEX V. UNITED STATES

19-6277      RUVALCABA-GARCIA, MARIO V. UNITED STATES

19-6290      PINEDA-CASTELLANOS, SERVANDO V. UNITED STATES

19-6343      RICHMOND, ANTOINE V. UNITED STATES
```